650 So.2d 1362 (1995)
Elton KENNEDY
v.
Grace KENNEDY.
No. 92-CA-1168.
Supreme Court of Mississippi.
February 2, 1995.
As Modified on Denial of Rehearing March 23, 1995.
*1363 Joseph A. Fernald, Jr., Brookhaven, for appellant.
Samuel E. Farris, Hattiesburg, for appellee.
Before DAN M. LEE, P.J., and McRAE and SMITH, JJ.
DAN M. LEE, Presiding Justice, for the Court:
Elton Kennedy ("Elton") sought modification, by reduction or termination, of the decree of the Marion County Chancery Court which required him to pay Grace Kennedy ("Grace"), his wife of nineteen (19) months, *1364 $1,500.00 per month for separate maintenance, plus a car, car insurance, tag costs, medical and dental expenses. The chancellor found that Elton had suffered a substantial reduction in income since the rendition of the separate maintenance decree of February 24, 1989, and yet refused to reduce or terminate Elton's future separate maintenance obligations. The chancellor also held Elton in contempt of court for failing to pay past due separate maintenance and ordered that he be jailed until he purged himself of contempt. Aggrieved by the chancellor's ruling, Elton assigns as error the following:
1. WAS THE CHANCELLOR'S DECISION MANIFESTLY WRONG AND AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE?
2. WAS ELTON KENNEDY IN CONTEMPT OF THE FEBRUARY 24, 1989, ORDER ENTERED BY THE MARION COUNTY CHANCERY COURT?
3. HAS THERE BEEN A MATERIAL CHANGE IN CIRCUMSTANCES ARISING SUBSEQUENT TO THE DECREE OF FEBRUARY 24, 1989 TO WARRANT A MODIFICATION OF SEPARATE MAINTENANCE?
4. THE AWARD IS UNCONSTITUTIONAL AND IS VIOLATIVE OF THE EQUAL PROTECTION AND DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.
We will address Elton's first three assignments of error, however, because we cannot tell from the record whether the constitutionality of separate maintenance was argued in the court below, we will not address assignment of error number 4.
After reviewing the record and briefs in this case, we affirm the chancellor's decision to hold Elton Kennedy in contempt of court for failure to pay Grace's separate maintenance payments up to the October 6, 1992 hearing. However, we find that the chancellor's failure to reduce or terminate Elton's future separate maintenance payments was manifest error and, therefore, reverse the chancellor's ruling that Elton was not entitled to a reduction or termination of future separate maintenance and remand for further proceedings on this issue.

FACTS
On July 26, 1987, Elton Kennedy married Grace McDaniel Kennedy. This was the second marriage for both parties. Elton's first wife of 27 years died of cancer in 1986, and Grace's husband was killed in a 1975 airplane crash. After seven months of marriage, Elton, dissatisfied with the marriage, left Grace on or about February 27, 1988. Grace initiated a separate maintenance action against Elton in the Marion County Chancery Court shortly thereafter. In his order of February 24, 1989, the chancellor awarded Grace $1,500.00 per month in separate maintenance, plus a car, car insurance, tag costs, medical and dental expenses. The chancellor also ordered that Elton pay court costs and $3,000.00 toward Grace's attorney's fees.
Elton appealed this award and this Court affirmed the chancellor's order without a written opinion on March 21, 1990. Kennedy v. Kennedy, 557 So.2d 1197 (Miss. 1990). Subsequent to this ruling, relations between Elton and Grace did not improve. Grace brought contempt charges against Elton in the Marion County Chancery Court several times for contempt of the original order. On each of these previous occasions, the chancellor found that Elton was in contempt of court and ordered that he be arrested and jailed until he purged himself of contempt. Elton, on these prior occasions, paid his arrearages into the court and was not jailed.
A chronology of the events that culminated in this appeal are detailed to-wit:
1. On January 7, 1992, Grace Kennedy filed a Petition to Cite Elton Kennedy For Contempt for failure to pay her separate maintenance, medical bills, attorneys fees and to carry insurance on her vehicle.
2. On May 19, 1992, Elton Kennedy filed a Motion To Modify Judgment For *1365 Separate Maintenance naming Grace Kennedy as defendant.
3. On June 11, 1992, Grace Kennedy filed an Amendment To Petition To Cite For Contempt naming Elton Kennedy as the defendant.
4. On October 6, 1992, Chancellor Sebe Dale, Jr., heard testimony from Grace Kennedy and Elton Kennedy in support of their respective petitions.
5. On October 22, 1992, the Marion County Chancery Court entered a Memorandum Opinion stating that Elton Kennedy was guilty of willful contempt of court and denied Elton's Motion to Modify Judgment of Separate Maintenance.
In his Memorandum Opinion of October 22, 1992, the chancellor upheld Order of separate maintenance dated February 24, 1989, and found that Elton was delinquent $5,050.00 in separate maintenance payments as well as $883.50 for Grace's unpaid medical expenses. The chancellor addressed Elton's Petition For Modification of Separate Maintenance and opined:
[a]s to the modification petition: Though Elton has shown a reduction in his income from the date of the initial order of the Court for separate maintenance and related payments, he has nevertheless wholly failed to convince the Court that he is presently without the ability to comply with the Court's prior judgment, or that his compliance therewith will deprive him of a reasonable standard of living for himself. The Court therefore concludes that Elton is not entitled to a modification of the ordered separate maintenance and related payments. (emphasis added)
The chancellor clearly found that "Elton had shown a reduction in his income from the date of the initial order of the Court for separate maintenance and related payments, ... ." However, in the same breath, the court then stated that Elton had not demonstrated that he was without the present ability to comply with the court's order. The chancellor did not suggest how Elton could pay the assessed separate maintenance, but, in his memorandum opinion, the chancellor listed all of Elton's assets.
Elton worked for Sonat Exploration as a lease operator at the time of the February 24, 1989, separate maintenance order and received approximately $32,000.00 per year in salary from Sonat. In 1991, UMC Petroleum bought the field where Elton worked. UMC Petroleum did not offer Elton a job and therefore, Elton was forced to accept a job with Sonat as a roustabout on an offshore production rig. Elton worked on the offshore production rig for approximately three months and then, confronted with the prospect of working a job that he was physically unable to perform at age 59, and not offered any other job with Sonat, took voluntary retirement in September of 1991.
At the time of the October 6, 1992, hearing, Elton received a gross monthly pension payment of $438.00 from Sonat. Elton also received $878.00 quarterly from dividends on his Sonat stock and $539.26 every six months from a certificate of deposit that he owned. Elton showed a total monthly income of $820.54 from these sources. Elton admitted that he received approximately $500.00 to $600.00 per month from oil and gas royalty payments, but he has continuously given his two children about $250.00 per month per child as their part of their mother's inheritance from these oil and gas revenues.
Grace's attorney questioned Elton as to the amount of money that Elton had in certificates of deposit during 1989-1991. Elton testified that he had about $15,184.00 in an individual retirement account and about $20,600.00 in a certificate of deposit. Elton further testified that he had expended other monies that he had in certificates of deposit and savings accounts to pay Grace's separate maintenance, attorney's fees, and his own personal bills. Grace's attorney further questioned Elton as to whether or not he had sold any cattle (he had and, according to income tax returns for 1991, his total farm *1366 income showed a loss of approximately $6,753.00) or if he had sold any timber from his property (he had not). At the time of the October 6, 1992 hearing, Elton owned 1733 shares of Sonat stock worth approximately $38.00 per share. Elton acquired this stock through an employee stock option plan while with Sonat.
Grace admitted that in 1989, she sold a house and six acres of land, and, in 1991, she sold additional acreage that she owned. Grace was questioned by Elton's attorney as to why she did not work. Grace stated that she was in poor health and "cannot hold a job." When asked if she had filed for any type of disability payments, Grace answered that she had not. Grace further testified that her grown son Ricky lived with her and did not pay room and board because "Elton kept threatening me." However, she testified that Ricky occasionally gave her money.
The chancellor, after hearing all of the testimony, refused to terminate or reduce Elton's separate maintenance payments to Grace. The chancellor found that Elton had suffered a reduction in income but that he was not convinced that Elton was without the present ability to pay the $1,500.00 per month in separate maintenance payments and $883.50 medical expenses.
Because Elton was delinquent in his separate maintenance payments, the chancellor found that Elton was in contempt of court for failing to comply with the terms of the 1989 separate maintenance decree. Accordingly, the chancellor ordered that Elton be jailed until he purged himself of contempt by paying all sums due and payable under the terms of the February 24, 1989, decree for separate maintenance, plus $883.50 medical expenses.

DISCUSSION
For the sake of clarity we will combine Elton's first two assignments of error.

WAS THE CHANCELLOR'S DECISION MANIFESTLY WRONG AND AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE?

WAS ELTON KENNEDY IN CONTEMPT OF THE FEBRUARY 24, 1989, ORDER ENTERED BY THE MARION COUNTY CHANCERY COURT?

STANDARD OF REVIEW
This Court will not overturn the decision of a chancellor in domestic cases when those findings are supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, or applied an erroneous legal standard. Crow v. Crow, 622 So.2d 1226, 1228 (Miss. 1993); Gregg v. Montgomery, 587 So.2d 928, 931 (Miss. 1991). Cf. Herring Gas Co. Inc., v. Whiddon, 616 So.2d 892 (Miss. 1993) (same standard of review in non-domestic case); Empiregas, Inc. of Kosciusko v. Bain, 599 So.2d 971 (Miss. 1992). As a result of this deferential standard of review, the chancellor's findings will only be overturned if they are manifestly wrong. Whitworth v. Kines, 604 So.2d 225 (Miss. 1992); Wing v. Wing, 549 So.2d 944 (Miss. 1989).

CONTEMPT OF COURT
In the case sub judice, Elton argues that the chancellor's decision to hold him in contempt of court for failure to pay separate maintenance was manifest error. Elton argues that he was without the present ability to pay Grace's separate maintenance and therefore, the chancellor should not have held him in contempt of court. Grace argues that Elton has the ability to pay separate maintenance and thus, the chancellor's ruling was not manifestly wrong.
It is well established that in domestic relations cases, when a party has demonstrated a prima facie case of contempt, the contemnor may avoid the judgment of contempt by establishing that he is without the present ability to pay his obligations. Gebetsberger v. East, 627 So.2d 823, 826 (Miss. 1993); see also Duncan v. Duncan, 417 So.2d 908 (Miss. 1982). If the party in contempt raises inability to pay as a defense, the contemnor must shoulder the burden of proving *1367 his inability to pay, and this proof must be established with particularity and not in general terms. Gebetsberger, 627 So.2d at 826; Newell v. Hinton, 556 So.2d 1037, 1042 (Miss. 1990); Caldwell v. Caldwell, 579 So.2d 543, 546 (Miss. 1991); Riser v. Peterson, 566 So.2d 210, 211 (Miss. 1990).
Elton seeks to have this Court overrule the chancellor's finding of contempt by arguing that he was without the present ability to pay Grace's past-due separate maintenance payments and that the chancellor erroneously refused to terminate or reduce his separate maintenance payments. While we agree that Elton's separate maintenance payments are in need of modification, we affirm the chancellor's decision to hold Elton in contempt of court until he satisfies his separate maintenance arrearages.
Separate maintenance may be modified by increasing, decreasing or terminating the award, in the event of a material change in circumstances subsequent to the decree awarding separate maintenance. Landrum v. Landrum, 498 So.2d 1229 (Miss. 1986).
At the October 6, 1992, hearing, the burden was on Elton to purge himself of his contempt by showing: (1) that he had complied with the decree; or (2) that he was unable to comply with the decree; or (3) or that it was impossible for him to perform his obligation. Rainwater v. Rainwater, 236 Miss. 412, 110 So.2d 608 (1959). Elton did not prove with particularity at the October 6, 1992, hearing that he had complied with the February 24, 1989, separate maintenance decree, or that he was unable to comply with the chancellor's earlier decree, or that it was impossible for him to perform his obligation. The record indicates that Elton had funds available to satisfy his present arrearages. In fact, Elton, on prior occasions when faced with contempt charges, had taken money from these funds to satisfy his past-due obligations to Grace. In this instance, the chancellor found, inter alia, that Elton had failed to convince the court that his delinquencies in separate maintenance payments were the result of "inability on his part to comply with the Court's orders." Therefore, we cannot say that the chancellor was manifestly wrong, abused his discretion, or applied an erroneous legal standard. Crow v. Crow, 622 So.2d 1226, 1228 (Miss. 1993).

HAS THERE BEEN A MATERIAL CHANGE IN CIRCUMSTANCES ARISING SUBSEQUENT TO THE DECREE OF FEBRUARY 24, 1989 TO WARRANT A MODIFICATION OF SEPARATE MAINTENANCE?
To prevail on this assignment of error, Elton must show that the chancellor committed manifest error in denying his request for a reduction in separate maintenance payments. Crow, 622 So.2d at 1228. The test to determine if an award of separate maintenance may be modified is found in Landrum v. Landrum, 498 So.2d 1229, 1230 (Miss. 1986). That test is as follows:

a decree for separate maintenance may be modified upon a petition presented because of a material or substantial change of circumstances arising subsequent to the date of the decree. (emphasis added).
Landrum, 498 So.2d at 1230; Wilson v. Wilson, 198 Miss. 334, 343, 22 So.2d 161 (1945); Malone v. Malone, 159 Miss. 138, 143, 131 So. 870 (1931).

SEPARATE MAINTENANCE
In Daigle v. Daigle, 626 So.2d 140 (Miss. 1993), we defined separate maintenance and gave our justification for awarding a spouse separate maintenance:

"Separate maintenance is a `court-created equitable relief based upon the marriage relationship." Lynch v. Lynch, 616 So.2d 294, 296 (Miss. 1993) (quoting Robinson v. Robinson, 554 So.2d 300, 303 (Miss. 1989)). "It is well-established that `[a] decree for separate maintenance is a judicial command to the husband to resume cohabitation with his wife, or in default thereof, to provide suitable maintenance of her until such time as they may be reconciled to each other.'" Lynch, 616 So.2d at *1368 296 (quoting Bunkley & Morse, Amis on Divorce and Separation in Mississippi, § 7.00 (2d ed. 1957)). (emphasis added).
Daigle, 626 So.2d at 145; see also Thompson v. Thompson, 527 So.2d 617, 621 (Miss. 1988).
In the case at bar, the chancellor's initial award of separate maintenance failed to achieve its stated goal. That is, to force Elton to resume cohabitation with Grace and save their marriage that, for all practical purposes, existed for seven months.
Now, seven years after they were married and five years after the chancellor's initial decree, Elton seeks to either terminate or reduce his separate maintenance payments to Grace. Although Grace's initial award of separate maintenance was upheld by this Court, Elton is not barred from appealing the chancellor's refusal to grant his request for modification or termination. Landrum v. Landrum, 498 So.2d 1229, 1230 (Miss. 1986).
Elton alleges that his subsequent retirement and reduction in mineral royalty income constitutes a substantial change in circumstances arising subsequent to the separate maintenance decree of February 24, 1989. Elton argues that the chancellor should have granted his petition to modify his separate maintenance obligation and the chancellor's failure to do so constituted manifest error. As discussed above, a chancellor's findings will not be disturbed unless they are manifestly wrong. Crow, 622 So.2d at 1228.
Grace argues that Elton's change in circumstances resulted directly from his voluntary retirement and that the court should not grant Elton a reduction in his separate maintenance payments because of his voluntary retirement[1]. Grace argues that if this Court allows Elton a reduction in separate maintenance all men who are paying separate maintenance to their spouses will voluntarily quit their job, retire, or transfer their property to their children.
We believe that McEwen v. McEwen, 631 So.2d 821 (Miss. 1994), is analogous to the case at bar, and therefore, dispositive. This Court in McEwen, when confronted with a father's attempt to have his child support payments reduced, held that the father had undergone a substantial change of circumstances and was deserving of such reduction. The chancellor in McEwen, as in the case sub judice, recognized that the party seeking a reduction in his support payments had suffered a decrease in income and yet held that the moving party was not entitled to a reduction in his support payments.
As is the case with modification of separate maintenance payments, the party seeking a modification of child support payments must demonstrate a "substantial and material change in the circumstances of one of the interested parties arising subsequent to the entry of the decree sought to be modified." McEwen, 631 So.2d at 823, citing Gillespie v. Gillespie, 594 So.2d 620, 623 (Miss. 1992). In McEwen, the father suffered a heart attack which drastically reduced his ability to produce income. Id. The father sought a reduction in his child support payments and the chancellor found that McEwen had suffered some decrease in income; however, the chancellor did not find that there was a material change in circumstances sufficient to warrant a modification in the court's previous order. Id. at 822.
In McEwen, the evidence adduced at the modification hearing showed that Casey (the father) had earned approximately $52,000.00 per year before his heart attack and, subsequent *1369 to the heart attack, he earned approximately $28,000.00 per year. Casey's monthly take home pay after his heart attack was approximately $1,400.00. Of that $1,400.00, Casey was required to pay $800.00 per month in child support. This Court held that Casey was entitled to lead a decent life, and that the chancellor's refusal to modify his support obligation would not allow him to do so. McEwen, 631 So.2d at 824.
In the case sub judice, Elton does not dispute the fact that he took "voluntary retirement" from Sonat. Sonat sold the field where Elton worked as a lease operator and offered Elton a job as a roustabout on an offshore production platform. Webster's New Collegiate Dictionary 1001 (1979) defines "roustabout" as:
1 a: Deckhand b: Longshoreman 2: an unskilled or semiskilled laborer [especially] in an oil field or refinery... .
Elton was approximately 59 years old when he was forced to leave his onshore job with Sonat and take a job in the Gulf of Mexico on an offshore production platform. Elton worked as a roustabout for approximately three months and began having problems with his knees. Because of his knee problems, Elton could not carry heavy loads up and down the steps of the platform as his job required. Due to his inability to perform the strenuous physical job requirements of a roustabout, Elton was forced to retire. Elton testified, without contradiction, that he was not offered another position with Sonat and that he has been unable to find other work since his "voluntary retirement."
The February 24, 1989, separate maintenance decree awarded Grace $1,500.00 per month, plus a car, automobile insurance, tag costs, medical, and dental expenses. This award was based upon a finding that Elton made over $142,000.00 from minerals in 1986, $95,000.00 in 1987, and his total gross income in 1988 was approximately $141,000.00.
At the October 6, 1992, hearing, Elton submitted wage statements into evidence relating to his pension, dividend, and interest income. Elton was earning anywhere from $400.00 to $600.00 per month in oil and gas royalties in addition to approximately $820.00 per month he received from his Sonat pension and dividend payments. Elton also testified that he continued to give each of his two children, as he had since 1989, about $250.00 per month from oil and gas royalty payments. These sums represent a substantial negative material change in Elton's income when compared with his late 1980's income upon which the 1989 award was based.
In the case sub judice, as in McEwen, supra, Elton sought a modification of support payments and demonstrated by uncontroverted evidence that physical infirmities drastically curtailed his ability to earn a living. Accordingly, we reverse the chancellor's refusal to allow Elton a modification of Grace's separate maintenance payments.
This Court will not only consider whether Elton has undergone a material change in circumstances, but will also look to the equities of the case sub judice. Separate maintenance is a court-created equitable relief based upon the marital relationship. Daigle, 626 So.2d at 145. (emphasis added). In such cases, we have recognized that equitable principles must govern all decisions regarding separate maintenance. Gardiner v. Gardiner, 230 Miss. 778, 93 So.2d 638 (1957).
Here, both parties brought separate estates, along with separate careers, to the marriage. Grace's separate estate consisted of a house on six acres of land, another 57 acres of additional land in Marion County, Mississippi, and, in addition, a vehicle and other assorted personal property.
From the outset of the marriage, Elton owned more assets than did Grace. Elton and Sophie Sue Forbes Kennedy (Elton's deceased first wife) were given 327 acres of land and various mineral rights by her parents during their twenty-seven year marriage. When Elton married Grace, he owned a home and assorted farm equipment, along *1370 with stock acquired from Sonat, through an employee stock option plan. Elton also had money in certificates of deposit and in an individual retirement account.
After Elton left Grace, the chancellor awarded Grace separate maintenance. Elton earned a substantial living from both his job and oil and gas royalty payments at the time of the initial decree. However, as discussed supra, Elton's earnings were drastically reduced due to external forces beyond his control in the oil and gas markets. Subsequent to this material change, Elton was forced to continue paying separate maintenance based upon his prior income.
Before Grace married Elton, she worked and provided for her own support. However, after marrying Elton, Grace was terminated by her employer for failing to maintain satisfactory production in sales due to her "deteriorating health." Since being terminated, Grace has not attempted to obtain any type of employment or disability benefits to help provide for her support; instead, Grace looks to Elton as her sole means of support. This Court, in Thompson v. Thompson, 527 So.2d 617, 622 (Miss. 1988), quoted Amis, Divorce and Separation in Mississippi (1st ed. 1935), and stated:
The purpose [of separate maintenance] should be to provide, as nearly as may be possible, the same sort of normal support and maintenance for the wife, all things considered, as she would have received in the home, if the parties had continued normal cohabitation, and the wife had helped in a reasonable way, in view of her health and physical condition, to earn her own support and that of the family.
Thompson, 527 So.2d at 622. As discussed above, Elton's ability to earn income and support Grace has changed dramatically. As a result of this change in Elton's financial status, it would be inequitable to require Elton to continue to provide Grace with the same level of separate maintenance payments while his monthly income has been so drastically reduced. Therefore, we hold that the chancellor committed reversible error when he refused to reduce or terminate Elton's separate maintenance payments to Grace.

CONCLUSION
In closing, we affirm the chancellor's decision to hold Elton in contempt of court for failure to pay past due separate maintenance up to October 6, 1992. However, we find the chancellor was manifestly in error in not reducing or terminating the separate maintenance award to Grace from and after the hearing of October 6, 1992, and accordingly, we reverse and remand for a hearing not inconsistent with this opinion. On remand, the lower court should apply the factors found in Gray v. Gray, 484 So.2d 1032, 1033 (Miss. 1986), to determine what, if any, amount of separate maintenance Elton should pay Grace.
AFFIRMED IN PART; REVERSED AND REMANDED IN PART FOR ADDITIONAL PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.
HAWKINS, C.J., PRATHER, P.J., and SULLIVAN, PITTMAN, BANKS, McRAE, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
NOTES
[1] In Parker v. Parker, 645 So.2d 1327 (Miss. 1994), this Court recognized that bad faith is an element to be considered when determining whether a change in circumstances warrants modification of support. "The law is well-settled that, if an obligor, acting in bad faith, voluntarily worsens his financial position so that he cannot meet his obligations, he cannot obtain a modification of support." Parker, at 1331. Quoting Willis v. Willis, 820 P.2d 858 (Or. 1991), citing Nelson v. State, 225 Or. 257, 357 P.2d 536 (1960). In the record before us, there is no proof that Elton acted in bad faith when he retired from his job as a roustabout. Parker, 645 So.2d at 1331. Accordingly, this argument is without merit.