910 So.2d 603 (2005)
Shelly Dawn GLISSEN, Appellant
v.
Jody Shane GLISSEN, Appellee.
No. 2003-CA-02322-COA.
Court of Appeals of Mississippi.
March 1, 2005.
*605 Tina Lorraine Nicholson, Jackson, attorney for appellant.
*606 Danny L. Lowrey, Corinth, attorney for appellee.
Before LEE, P.J., MYERS and CHANDLER, JJ.
CHANDLER, J., for the Court.
¶ 1. Shane Glissen filed a motion for change of custody for his daughters after he discovered that his ex-wife, Shelly Glissen, had been living with a man out of wedlock. The Alcorn County Chancery Court held that Shelly demonstrated questionable judgment in associating with her new boyfriend, found that Shelly had not been truthful with the court, and found that the effects of Shelly's new relationship constituted a material change in circumstances that adversely affected the girls. The chancellor went on to find that the girls' best interests would be served by allowing Shane to have custody of the girls. Shelly appeals, raising the following issues:
I. WHETHER THE CHANCELLOR ERRED IN FINDING A MATERIAL CHANGE IN CIRCUMSTANCES THAT ADVERSELY AFFECTED THE CHILDREN
II. WHETHER THE CHANCELLOR ERRED IN FINDING THAT SHELLY WAS MORALLY UNFIT TO HAVE CUSTODY OF HER CHILDREN
III. WHETHER THE CHANCELLOR ERRED IN ITS EVALUATION OF THE ALBRIGHT FACTORS
¶ 2. Finding no reversible error, we affirm.

FACTS
¶ 3. Shelly Dawn Glissen and Jody Shane Glissen divorced on June 7, 1995. The couple produced two children, Erin Lindsey Glissen, born January 13, 1991, and Dana Nicole Glissen, born October 28, 1993. The divorce decree awarded permanent physical custody of the children to Shelly. In 1998, Shelly moved to Mesquite, Texas, with her children.
¶ 4. On July 31, 2001, the Alcorn County Circuit Court entered an order of temporary custody. It allowed Shelly to retain physical custody, but it granted temporary custody of the children to Shane for the 2001-2002 school year for the purpose of enrolling the children into the Alcorn County School District. The court entered another temporary custody order on August 29, 2002. The 2002 order was identical to the 2001 order, except that it pertained to the 2002-2003 school year.
¶ 5. After the end of the 2002-2003 school year, and the expiration of the temporary custody, Shane requested that the court give him permanent physical custody of Erin and Dawn, on the grounds that he had remarried and was able to provide a stable home for the children. Shane alleged a material change in circumstances by stating that Shelly was living with a man out of wedlock. The Alcorn County Chancery Court conducted a hearing on September 17 and 18, 2003, to determine whether a change in custody was warranted.
¶ 6. In August 2002, and continuing until the day of the hearing, Shelly began dating a man named Brent Nixon. The chancellor was disturbed with the actions of Shelly in choosing Nixon for a boyfriend, and he was concerned that Nixon would be a poor role model as a potential stepfather.[1] The chancellor found that Shelly had been cohabitating with a married man.[2] The *607 chancellor found that the continuing effect of this cohabitation led to a potential for a material change in circumstances. In addition to the cohabitation, the chancellor was concerned that Shelly was living with a convicted felon, which Shelly testified she discovered the day of the hearing. Nixon also declared bankruptcy, and his home and car were repossessed as a result of this bankruptcy. The chancellor questioned Shelly's ability to take care of the girls if she is living with a convicted felon who is bankrupt. He also questioned Shelly's judgment because she was unaware of Nixon's felony conviction until the day of the hearing.[3]
¶ 7. The testimony at the hearing showed Nixon to be a man of questionable character. Nixon's ex-wife testified that Nixon's probation following his felony conviction was revoked for drug use. She testified that Nixon had a history of drug use and drinking problems and had become violent. She testified that he was often drunk when he came to pick up his children. There were assault charges placed against Nixon in August 2001. She testified that Nixon had visitation with his own children for forty-five days in the summer, but after one week he told his ex-wife to come get the children. She testified that Nixon has not kept a job for more than three months. At the time of the hearing, he had not paid child support in six months and owed her $4,000 in child support.
¶ 8. Although Shelly and Nixon both denied that they were living together, the chancellor found that Shelly and Nixon had been cohabitating. This finding was based on the testimony of Nixon's ex-wife and the Glissens' younger daughter, Dana. The chancellor found that Shelly's association with Nixon and her efforts to downplay the seriousness of her relationship with Nixon constituted a material change in circumstances. While Shelly testified that she was a person of high morals and taught the children moral principles, the chancellor questioned the sincerity of this testimony. He said, "Her actions don't backup her words." Shelly's relationship with Nixon was serious enough that Nixon, a bankrupt man who owed $4000 in child support at the time of the hearing, was able to find money to pay for a flight from Dallas to Memphis in order to testify.[4] The chancellor found that Shelly and Nixon were not being truthful with the court. The court acknowledged that the effects of Shelly's cohabitation had not adversely affected the girls at the time of the hearing, because the girls were with their father during the cohabitation. However, the court found a material change in circumstances because the chancellor was concerned with Shelly's living arrangement and could not find that "the foreseeable future will be any different in the household of a lady that is seeking to retain custody of these children."
¶ 9. After the chancellor found that there was a material change in circumstances that were adverse to the well-being of the girls, the chancellor considered whether a change of custody would be in the girls' best interests. He evaluated the testimony of Shane's current wife and the girls' stepmother, Mandy Glissen. He found Mandy to be one of the most credible witnesses he has ever heard on *608 the witness stand, and that she was fully capable of taking care of the girls. The chancellor applied the eleven factors for making a custody decision as announced in Albright v. Albright, 437 So.2d 1003 (Miss. 1983). The chancellor ultimately found that the Albright factors favored Shane. Specifically, the chancellor found that Shane's employment situation was more stable; that Shane demonstrated better moral fitness; that the school in Alcorn County was better for the girls than the school in Texas; that the father offered a more stable home; and that most of the girls' family lived in Mississippi.
¶ 10. Shelly argues that Shane failed to prove either a material change in circumstances or that Shelly's lifestyle had an adverse effect on the children. She also argues that the chancellor erred in allowing his personal, "old fashioned" values to influence the consideration of the case.

ANALYSIS
¶ 11. The law with regard to modification of a custody decree is well-settled. First, the moving party must prove by a preponderance of the evidence that, since entry of the judgment or decree sought to be modified, there has been a material change in circumstances which adversely affects the welfare of the child. Ash v. Ash, 622 So.2d 1264, 1266 (Miss.1993). Second, once such an adverse change has been shown, the moving party must show by like evidence that the best interest of the child requires the change of custody. Pace v. Owens, 511 So.2d 489, 490 (Miss. 1987).
¶ 12. Chancellors are awarded broad discretion in domestic relations cases. With respect to each issue, our standard of reviewing the chancellor's decision is clear: "This Court will not overturn the decision of a chancellor in domestic cases when those findings are supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, or applied an erroneous legal standard." Kennedy v. Kennedy, 650 So.2d 1362, 1366 (Miss.1995).

I. WHETHER THE CHANCELLOR ERRED IN FINDING A MATERIAL CHANGE OF CIRCUMSTANCES THAT ADVERSELY AFFECTED THE CHILDREN

(A) Whether The Chancellor Abused His Discretion In Finding A Material Change In Circumstances

1. Whether the chancellor erred in considering Shane's remarriage as a material change in circumstances
¶ 13. In setting the stage for his findings, the chancellor noted the change in marital status of each party. Shelly claims that it was error for the chancellor to have considered the fact that Shane had remarried and that Shelly had not remarried to be a material change in circumstances. The court stated:
What has happened then to show a substantial and material change in circumstances of the parties as it affects these children? If there has been how has that adversely affected the children? We have got to get by those first two steps. And the testimony that we see in this is that, of course Mrs. Glissen desires to retain custody of these children. She has not remarried. The father, the plaintiff in this case, the movant, has remarried and established, obviously, a good home for these children.
¶ 14. Shelly correctly notes that Mississippi law "has long held that remarriage itself does not constitute a material change in circumstances that would justify a change of custody." Robison v. Lanford, 841 So.2d 1119, 1123(¶ 14) (Miss.2003) (citing *609 Allen v. Allen, 243 Miss. 23, 33, 136 So.2d 627, 632 (1962)). The chancellor made it clear in his opinion that the material change in circumstances that justified a change of custody was Shelly's association with a man of questionable character and not the parties' change in marital status. This issue is without merit.

2. Whether the chancellor abused his discretion in finding that Shelly cohabitated with Nixon
¶ 15. In reaching his conclusion that Shelly and Nixon were cohabitating, the chancellor relied on the testimony of Nixon's ex-wife, Shaunda Wachtel, who believed that Nixon moved in with Shelly in December, 2002. She testified that she received notice from the bankruptcy court that Nixon lost his house and that his vehicle was repossessed from Shelly's address. Nixon gave Wachtel Shelly's address for delivery of their children and made arrangements for their children to be picked up or dropped off at Shelly's apartment. Wachtel further testified that she sometimes heard her children and Shelly in the background when she talked on the phone with Nixon. When Shelly was asked about what happened to Nixon's house after the bankruptcy, Shelly responded that she could not testify about his personal matters.
¶ 16. The chancellor also relied on the testimony of the Glissens' younger daughter, Dana. In the chancellor's chambers, Dana testified that Nixon sometimes slept overnight in Shelly's apartment. Dana testified that Nixon stayed overnight about three times a week. The chancellor asked her where Nixon sleeps when he stayed overnight. Dana responded, "In bed with my mom. The little three-year-old [Nixon's child] sleeps in the bed with mama and Brent."
¶ 17. The Glissens' older daughter, Erin, testified that Nixon never spent the night at Shelly's apartment when she was there. Shelly testified that Nixon asks Wachtel to come to the apartment to pick up and drop off the children because Nixon's father is her neighbor. Shelly pointed out that the reason she was sometimes present when Wachtel called Nixon was that Wachtel called him on his cell phone while he was at Shelly's apartment. Shelly also explained why Dana had seen Nixon, Shelly, and Nixon's three-year-old in bed together. Shelly testified that Nixon's child went to sleep while Nixon and his child were visiting Shelly at her apartment; Shelly and Nixon, then, laid the child on Shelly's bed.
¶ 18. In domestic relations cases, the chancellor is vested with the assessment of witness credibility and the interpretation of evidence where it is capable of more than one reasonable interpretation. Andrews v. Williams, 723 So.2d 1175, 1178(¶ 10) (Miss.Ct.App.1998). This Court may reverse a chancellor's finding of fact in a domestic relations case only where the finding is manifestly wrong. Dillon v. Dillon, 498 So.2d 328, 329 (Miss. 1986). We find that the chancellor's finding that Shelly was cohabitating with Nixon was established by credible evidence.
¶ 19. Shelly further asserts that, even if Nixon did sometimes spend the night at Shelly's apartment when the children were there, those occasions were isolated incidents that would not constitute an overall change in circumstances. Specific, isolated incidents do not justify a change in custody. Touchstone v. Touchstone, 682 So.2d 374, 379 (Miss.1996); Brown v. Brown, 764 So.2d 502, 504(¶ 6) (Miss.Ct.App. 2000). Shelly argues that the children's visits with their mother were, in themselves, isolated incidents. The children lived with Shane in Mississippi for *610 most of the 2002-2003 school year, the period at issue. Although Shelly correctly cites the law, this legal principle is inapplicable to the facts of this case. The chancellor specifically found that Shelly's relationship with Nixon was not an isolated incident but a continual affair. The chancellor found that the cohabitation continued up until the day of the hearing, after the children had returned to Texas. This issue is without merit.

3. Whether the chancellor erred in considering Shelly's move to Texas as a material change in circumstances
¶ 20. Shelly asserts that the chancellor improperly considered Shelly's move to Texas, which occurred in 1998, as a material change in circumstances. She asserts that all material changes in circumstances must have taken place after the entry of the most recent custody order, which in the case sub judice was August 29, 2002. We find that the chancellor did not use Shelly's move as evidence of a material change of circumstances. The chancellor explicitly stated that he would not consider events which occurred prior to August 29, 2002. In discussing Shelly's move to Texas, he was not discussing whether a material change in circumstances existed. He was explaining the "continuity of care" factor of Albright and the need to prevent the girls from continuously switching back and forth from Texas. The chancellor was within his discretion to consider the fact that Shelly was living in Texas in evaluating the best interests of the children.
¶ 21. In arguing that the chancellor should consider only the events after August 29, 2002, Shelly misstates the law. This Court has held, "Once custody of a child has been awarded to one parent a decree for child custody should not be changed from one parent to the other unless subsequent to the original decree there has been a material change in circumstances and then only after findings based on substantial evidence that such change of circumstances materially affects the children's welfare adversely." Clark v. Clark, 739 So.2d 440, 443(¶ 9) (Miss.Ct.App. 1999) (citing Smith v. Todd, 464 So.2d 1155, 1157 (Miss.1985)). This holding indicates that the court may consider all events that have taken place since the first custody order, which in this case was entered in 1995. The chancellor's error in restricting his findings of fact, however, was harmless.

4. Whether the chancellor erred in considering the temporary custody modification to be an implied modification of permanent custody arrangements
¶ 22. The chancellor did state that the temporary custody decrees were an implied modification of custody at that time. Shelly correctly states that a temporary modification cannot be used as evidence of a material change of circumstances. Forsythe v. Akers, 768 So.2d 943, 948(¶ 15) (Miss.Ct.App.2003) (citing Arnold v. Conwill, 562 So.2d 97, 100 (Miss.1990)). However, the chancellor was not ruling that the temporary custody arrangement was a reason for finding a material change of circumstances. He was simply setting out the respective positions of the parties. In fact, the chancellor expressly acknowledged, "[T]hose decrees specifically provided that the primary physical custody would remain with the mother and that she was a fit and proper person to have custody of these children." This issue is without merit.

5. Whether the chancellor considered the totality of the circumstances in awarding a change of custody
¶ 23. Courts should consider the totality of the circumstances in deciding *611 whether to modify custody. Kavanaugh v. Carraway, 435 So.2d 697, 700 (Miss.1983). In his ruling, the chancellor stated that he was considering the "totality of the circumstances" in deciding to change custody. Shelly argues that, notwithstanding this statement, the only pertinent circumstance the chancellor could have considered was the possibility that the children may have occasionally observed Nixon staying overnight at the apartment. We disagree with Shelly's characterization of the chancellor's opinion, as we will explain later.

(B) Whether the Children Were Adversely Affected by Shelly's Cohabitation
¶ 24. The evidence has shown that the children were happy and well-adjusted during Shelly's relationship with Nixon. The girls were described as "open and bubbly" during the year in question. The girls had participated in choir, basketball, cheerleading, soccer, and softball, had joined the Girl Scouts and had made friends. Shelly argues that the law requires an adverse effect on the children to have already taken place before a chancellor can consider a change of custody. She argues that the chancellor erred in citing potential future adverse effects as a reason to change custody.
¶ 25. This Court has held that it must be proven that the material change in circumstances "adversely affected the child." Forsythe v. Akers, 768 So.2d 943, 947(¶ 11) (Miss.Ct.App.2000). However, this statement does not stand for the proposition that a chancellor must wait for a child to be harmed before a chancellor modifies custody. In Riley v. Doerner, 677 So.2d 740, 744 (Miss.1996), the Mississippi Supreme Court stated, "[W]hen the environment provided by the custodial parent is found to be adverse to the child's best interest, and that the circumstances of the non-custodial parent have changed such that he or she is able to provide an environment more suitable than that of the custodial parent, the chancellor may modify custody accordingly. This must be so, for `in all child custody cases, the polestar consideration is the best interest of the child.'" (emphasis in original) (quoting Sellers v. Sellers, 638 So.2d 481, 485 (Miss. 1994)). We interpret Riley to allow a chancellor to modify child custody if the chancellor reasonably foresees that children will be harmed by a change in the custodial parent's lifestyle.

II. WHETHER THE CHANCELLOR ERRED BY DETERMINING THAT SHELLY WAS MORALLY UNFIT TO HAVE CUSTODY OF HER CHILDREN
¶ 26. The chancellor found that Shelly was a failure with regards to moral fitness. The chancellor stated, "[H]ere we find a lady who has moved to Texas who found a convicted felon for a boyfriend, who is sleeping with him with his own child in the presence of her children."
¶ 27. Shelly correctly notes that, under Mississippi law, the chancellor may not make a finding that a custodial parent is morally unfit merely because she has sexual relationships outside of marriage:
The supreme court has made plain, despite the criminal nature of these acts, that cohabitation is relevant only to the extent it can be shown to affect the child adversely. Cheek v. Ricker, 431 So.2d 1139, 1144 (Miss.1983). In effect the supreme court has indicated that the mores of modern society are such that moral conduct by a custodial parent is difficult to make a requirement in a divorce. Absent a finding of some conduct harmful in a more specific sense than the certain knowledge of sexual relations between unmarried adults, one *612 of whom is the custodial parent, the court has held that custody cannot be withheld on that basis.
Sullivan v. Stringer, 736 So.2d 514, 517(¶ 16) (Miss.Ct.App. 2000). The Mississippi Supreme Court has expanded on this theme and has held that a custodial parent's sexual behavior is not a per se barrier to the modification of custody. Id. at 517(¶ 18) (citing Cheek v. Ricker, 431 So.2d 1139, 1144-45 (Miss.1983)).
¶ 28. The case sub judice is distinguishable from Sullivan. In Sullivan, this Court reversed the chancellor because the chancellor made no findings other than the fact that the mother was cohabitating with another man. Id. at 516(¶ 9). The chancellor in Sullivan did not make a finding that the mother's cohabitation adversely affected the children. This Court made it clear in Sullivan that sexual relationships outside of marriage can be considered in a chancellor's decision to modify custody. "What we are left with is that the existence of the relationship is insufficient, but if the relationship is coupled with other conduct that indicates the custodial parent's behavior is harmful in additional ways, custody can be changed." Id. at 518(¶ 20).
¶ 29. In the case sub judice, the chancellor found that Shelly's relationship with Nixon has an adverse effect on the children. The chancellor found such a relationship would adversely affect the girls because Nixon refused to exercise full visitation rights with his own children, because the evidence showed that Nixon abused drugs and alcohol and became violent, and because Nixon was a convicted felon. The chancellor made it clear that Shelly's relationship with Nixon was not the sole reason for deciding to change custody. He also found Shelly to be untruthful, he questioned her judgment, and he found that she only pretended to be interested in morals. Finally, the chancellor noted that the girls were innocent and at an impressionable age. "They are innocent little girls. I would hope that they remain that way. But they are at a critical age in their lives that greatly effects [sic]  everything that happens to them greatly effects [sic] them, and it can't be just preaching, it's got to be living in their presence." The chancellor emphasized that the totality of the unique circumstances in the case sub judice led him to a finding of a material change in circumstances. "I find it [Shelly's relationship with Nixon and her denial of the extent of the relationship] to be a substantial and material change in circumstances under these conditions." We hold that Shelly's relationship with Nixon and the effect the relationship had on Shelly's parenting skills were sufficient to make a finding of material change in circumstances, because the chancellor explained why Shelly's conduct was harmful to the girls.

III. WHETHER THE CHANCELLOR ERRED IN ITS EVALUATION OF THE ALBRIGHT FACTORS
¶ 30. After the chancellor determined that a material change in circumstances had taken place, he proceeded to a consideration of the Albright factors. The chancellor found that these factors weighed in favor of Shane. Shelly argues that the Albright factors either did not weigh in favor of either parent or weighed in favor of Shelly. Consequently, Shelly asserts that it was error to change custody to Shane.
¶ 31. In child custody cases, the polestar consideration is the best interest and welfare of the child. Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983). In order to arrive at a custody arrangement that is in the child's best interest, the chancellor must make specific findings on *613 each of the factors listed in Albright: (1) age, health and sex of the child; (2) determination of the parent that had the continuity of care prior to the separation; (3) which parent has the best parenting skills and which has the willingness and capacity to provide primary child care; (4) the employment of the parent and responsibilities of that employment; (5) physical and mental health and age of the parents; (6) emotional ties of parent and child; (7) moral fitness of the parents; (8) the home, school and community record of the child; (9) the preference of the child at the age sufficient to express a preference by law; (10) stability of home environment and employment of each parent; and (11) other factors relevant to the parent-child relationship. Id.
¶ 32. In determining whether the chancellor abused his discretion in applying the Albright factors, an appellate court must review the evidence and testimony presented at trial under each factor to insure the ruling was supported by the record. Watts v. Watts, 854 So.2d 11, 13(¶ 5) (Miss.Ct.App.2003). Our review of the chancellor's findings is limited. This Court may reverse only if the chancellor was manifestly wrong, clearly erroneous, abused his discretion, or made findings that were unsupported by the record. Hollon v. Hollon, 784 So.2d 943, 947(¶ 13) (Miss.2001). Furthermore, differences in religion, personal values, and lifestyles should not be the sole basis for custody decisions. Albright, 437 So.2d at 1005.

Age, health, and sex of the child
¶ 33. The chancellor noted that the tender years doctrine, which favors the mother in awarding custody of young children, has been weakened but remains a relevant doctrine. The chancellor found this factor weighed equally between the parties because the girls had recently lived with their father for two years.

Continuity of care
¶ 34. The chancellor found this factor to be equal because the girls had spent eight and a half months of the past year with their father, and they had spent the last three and a half months with their mother.
¶ 35. Shelly argues that this decision was error because Shelly was the primary caregiver during the children's entire lives except for the eighteen months in Shane's temporary custody. We find no abuse of discretion. The evidence at the hearing showed that the girls were quite content living with their father in Alcorn County. The girls spoke with Shelly on the phone in the summer of 2003 and begged her to let them stay in Alcorn County. Mandy Glissen testified that both children had close relationships with their classmates and with Shane and Mandy and were upset about having to leave to go to Texas. Mandy also testified that Erin required counseling at her school in Texas because she cried every day.

Best parenting skills
¶ 36. The chancellor found that both parents loved the girls. He found that both parents had adequate parenting skills, although he had reservations of the mother's moral fitness. Nevertheless, he found the parties' parenting skills to be equal.

Employment of the parents
¶ 37. Shane had worked in the same job for the past twelve years. Shelly had worked in the same job for only two years. The chancellor awarded this factor to the father.
¶ 38. Shelly argues that the chancellor erred in awarding this factor to Shane. She avers that her own work history is unremarkable, with no evidence of job-hopping or instability. Moreover, she *614 points out the fact that Shane works twelve-hour shifts four days a week. This means that Shane is unable to be home with his girls during the week and be available to help them with homework or put them to bed. Shelly argues that this factor should have weighed in her favor.
¶ 39. We are unable to find an abuse of discretion in the chancellor's finding. The chancellor was concerned that Shelly had moved to Texas before she secured employment. We decline to reverse the chancellor's findings.

Physical and mental health of the parents
¶ 40. Neither parent has mental or physical impairments. This factor favored neither parent.

Emotional ties of the parent and child
¶ 41. The mother testified that, except for the two years the girls went to school in Mississippi, the girls had been with her since the day they were born. The chancellor found that both parents love the girls, and the girls love both their parents. The chancellor found this factor to be equal.

Moral fitness of the parent
¶ 42. The chancellor had not heard "one incomputable scintilla of evidence that would cast any aspersions on the moral fitness of the father or the stepmother. In fact, it's just been the opposite. I haven't had any supporting evidence of the moral fitness of the mother." The chancellor went on to say that Shelly's relationship with Nixon led him to believe that, with respect to the moral fitness of the mother, "she is a total failure." The chancellor awarded this factor to the father. There was no abuse of discretion in this finding, as we discussed earlier.

Home, school, and community record of the child
¶ 43. The girls made A's and B's at the school they attended in Alcorn County. At the time of the hearing, they had been in school in Texas for only four weeks and had not received any grades. Mandy Glissen is a teacher at the girls' school, and she testified that the teachers provide excellent one-on-one interaction and are vitally interested in the children. The chancellor was unable to find that the girls' school in Texas provided such personal attention. The chancellor awarded this factor to the father.

Preference of the child
¶ 44. The chancellor acknowledged that a child must be at least twelve years of age before he or she can express a custodial preference. Miss.Code Ann. § 93-11-65(1)(a) (Rev.2004). Erin refused to state a preference. Dana stated that she would prefer to live with her father, because she enjoyed going to school in Alcorn County. For this reason, the chancellor found that this factor related to the education of the children and awarded the factor to the father. The chancellor indicated that the preference of the children was a "significant" factor in his determination of custody. Shelly argues that the chancellor erred in considering Dana's preference.
¶ 45. The chancellor acknowledged the limitations for young children to express a preference in custody. The chancellor's opinion indicates that he considered this factor only to the extent that it related to the girls' education. This issue is without merit.

Stability of home and employment of the parent
¶ 46. The chancellor acknowledged that Shane lives in a mobile home and acknowledged that "a mobile home may not be as sophisticated as an apartment in Mesquite, Texas; but there is a difference between a house and a home." The chancellor found that the stability of Shane's home exceeded *615 the stability of Shelly's home. He awarded this factor to Shane.
¶ 47. Shelly argues that the chancellor erred in awarding this factor to Shane. She believes that the chancellor erred in finding Shelly's home unstable because of her relationship with Nixon. This argument misconstrues the chancellor's holding. The chancellor never held that Shelly's home was unstable. The chancellor based this finding on the chancellor's favorable impression of Mandy Glissen as a stepmother and the chancellor's belief that Shane and Mandy would be able to instill positive moral values in the girls. Shelly re-argues her position that Shelly's relationship and Shane's remarriage should not have been weighed in the chancellor's decision to change custody. However, this argument is misplaced once the chancellor evaluates the best interests of the children. There is no prohibition against considering the parents' marital status and the custodial parent's relationships when evaluating the children's best interests.[5] We decline to overrule the chancellor's finding.

Other Factors
¶ 48. The chancellor found that the girls had no connection to Mesquite, Texas, other than the fact that Shelly and her brother live there. The rest of the girls' family live in northeast Mississippi. The chancellor awarded this factor to the father.
¶ 49. We have declined to alter any of the chancellor's findings under Albright. Moreover, we recognize that none of the chancellor's findings under Albright favor Shelly. It was appropriate for the chancellor to award a change of custody to Shane.
¶ 50. THE JUDGMENT OF THE CHANCERY COURT OF ALCORN COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., BRIDGES AND LEE, P.JJ., MYERS, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR. IRVING, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.
NOTES
[1] Shelly and Nixon married in March 2004.
[2] The chancellor found that Shelly had been cohabitating with Nixon in December 2002. Nixon did not obtain a final divorce until January 2003.
[3] Nixon's felony conviction was in 1994, when he was seventeen years old, and it was for receiving stolen property.
[4] Shelly called Nixon after the proceedings had ended on September 17. Nixon made an emergency flight to Memphis the following morning.
[5] In fact, there is no prohibition against considering the parties' marital or relationship status in deciding whether a change of custody is warranted. Our courts have merely held that such factors cannot be per se reasons for changing custody. See, e.g., Allen v. Allen, 243 Miss. 23, 33, 136 So.2d 627, 632 (1962). "Generally the remarriage of either party is not of itself a sufficient reason for changing an order of custody. However, if remarriage and other circumstances reflect a material change in conditions which affect the welfare of the child, a prior decree may be modified or altered."