IRVING, J.,
for the Court.
¶ 1. The motion for rehearing is denied. The previous opinion of this Court is withdrawn, and this opinion is substituted therefor.
¶ 2. Steve Ruth and London Suzette Burchfield are the parents of Mara Leigh Ruth, a minor. Burchfield, Mara’s primary caregiver, filed a motion in the Lowndes County Chancery Court for modification of child support wherein she requested that Ruth’s monthly child support payments be increased. Burchfield also requested reasonable attorney’s fees. Thereafter, Ruth filed a response and counterclaim wherein he sought primary custody. The Lowndes County Chancery Court granted Burchfield’s request to increase Ruth’s child support payments but denied her request for attorney’s fees. The chancery court also declined to modify custody. Aggrieved by the chancellor’s findings, both parties now appeal. In his appeal, Ruth asserts: (1) that the chancellor erred in failing to find that a material change in circumstances has occurred that adversely affects Mara which requires a change in custody and (2) that the chancellor erred in finding that a material change in circumstances exists which warrants an increase in his child support payments. In her cross-appeal, Burchfield asserts that the chancellor erred in failing to award her attorney’s fees.
¶ 3. -Finding no reversible error, we affirm on both direct and cross-appeal.
FACTS
¶ 4. Mara was born on October 31, 1998. Ruth and Burchfield never married; however, paternity was established in 1999. At that time, Ruth was ordered to make monthly child support payments of $367.03, and he voluntarily began providing medical and dental insurance for Mara. Then, in May 2007, Burchfield filed a motion for modification of child support wherein she asserted that Mara’s financial needs had “materially increased.” Burch-field also requested that the court award her attorney’s fees. Shortly thereafter, Ruth filed a response and counterclaim for modification wherein he sought primary custody of Mara based on his contention that a material change in circumstances had occurred that had adversely affected Mara in the following ways: (1) that Mara had not been properly supervised while in Burchfield’s primary care, (2) that Burch-field was not properly addressing Mara’s educational needs, and (3) that Mara had been exposed to conduct that was detrimental to her moral upbringing. A hearing was held in August 2007. We briefly summarize the testimony as it relates to the issues raised by Ruth.
¶ 5. In his motion, Ruth argued that Burchfield had not exercised good judgment in selecting babysitters for Mara, namely Christian Alexa Burchfield (Lexie), Burchfield’s daughter from a previous relationship, and Kim Brasfield.[1] Burchfield testified that she did not see any problem with Lexie baby-sitting Mara, even though Lexie was only twelve years old, because Lexie was “very mature” for her age.
¶ 6. However, Burchfield expressed regret for continuing to allow Kim to babysit Mara after learning that Kim and Burchfield’s twenty-year-old son, Hunter, who lived in her home at the time, had *603 become involved in an inappropriate relationship. Burchfield admitted that, prior to learning of the relationship, she had allowed Kim to stay overnight at her home to baby-sit Mara while Hunter was also in the home. However, Burchfield stated that after she learned of the relationship, Kim was no longer allowed to stay overnight at her home. Nevertheless, Burch-field testified that she continued to allow Kim to baby-sit Mara for another two to three weeks. Burchfield testified that she should have fired Kim immediately upon learning of the inappropriate behavior.[2]
¶ 7. As for Ruth’s contention regarding Mara’s educational needs, the testimony reveals that Mara has struggled constantly with her schoolwork. Specifically, Mara’s kindergarten teacher recommended that she be held back but agreed to reconsider her position, provided that Mara showed signs of improvement by the start of the following school year. Burchfield testified that Ruth did not want Mara to be held back and that Ruth stated that it would be an embarrassment to his wife, Tracey, who taught at Mara’s school. Burchfield stated that she and Tracey worked with Mara throughout the summer and that Mara was able to move on to the first grade as scheduled.[3] Burchfield testified that Mara continued to be tutored by family members and Tracey during Mara’s first-grade school year, but Burchfield also stated that she did not seek assistance for Mara the following school year because, as far as she knew, Mara was progressing according to schedule. According to Burchfield, she was under the impression that Tracey was continuing to help Mara once a week when Mara went home with Tracey after school.
¶ 8. Ruth testified that he is actively involved in Mara’s academics. He stated that he asked Tracey to communicate with Mara’s teachers since she works at Mara’s school.[4] Ruth stated that he helps Mara with her schoolwork as much as he can but that he often defers to Tracey, since she is a teacher. Ruth acknowledged that he did not want Mara to be held back when she was in kindergarten because he thought that Mara has the ability to learn, even though she may do so at a slower pace than other students. Ruth testified that since Mara first began having problems in kindergarten, he would beg Burchfield to “tell [him] what’s going on.” According to Ruth, he expressed an interest in trying to obtain primary custody of Mara when she was a little over a year old but decided not to after being informed by his attorney that he would be fighting an uphill battle.
¶ 9. Ruth’s contention as it relates to Mara’s moral upbringing centers around certain conduct that he contends Mara has been exposed to while in Burchfield’s primary care, such as Hunter’s use of marijuana while living in Burchfield’s home and *604 Burchfield’s allowing men to stay overnight while Mara is present.
¶ 10. Burchfield testified about when she first became aware that Hunter was using marijuana while he lived in her home. She stated that she confronted Hunter about it and that he denied it. Burchfield testified that, despite his denial, she “got on to him” anyway and informed him that she would not allow him to use marijuana around the children. She testified that sometime thereafter she confronted Hunter again about his marijuana use and that he got upset and moved out of the house, only to return within approximately two to three weeks. Burchfield also stated that Hunter was not living with her at the time of the hearing, as he had recently moved out.
¶ 11. As for Burchfield’s response to Ruth’s assertion that she allowed men to stay overnight while Mara was present, Burchfield testified that she has had two boyfriends over the past two or three years, not including her current boyfriend. Burchfield testified that her current boyfriend has never spent the night at her house. However, she admitted that in the past, she has allowed men to stay overnight at her home. She also admitted that she had had sexual relations with a man that she allowed to stay overnight while her children were in the home. However, Burchfield stated that they did so in the privacy of her bedroom with the doors locked. She also stated that the children were usually asleep by the time she and the gentleman retired for the night and that he would usually leave for work before the children awoke.
¶ 12. Following the hearing, the chancellor issued an opinion and final judgment wherein he concluded that it would be in Mara’s best interest to remain in her mother’s primary care. The chancellor also increased Ruth’s monthly child support payments, finding that Mara’s financial needs have increased. The chancellor denied Burchfield’s request for attorney’s fees.
¶ 13. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
ANALYSIS AND DISCUSSION OF THE ISSUES
¶ 14. It is well settled that “[i]n a case disputing child custody, the chancellor’s findings will not be reversed unless manifestly wrong, clearly erroneous, or the proper legal standard was not applied.” Mabus v. Mabus, 847 So.2d 815, 818(¶ 8) (Miss.2003) (citing Hensarling v. Hensarling, 824 So.2d 583, 587(¶8) (Miss.2002)). Further, the Mississippi Supreme Court has held that “[t]he burden of proof is on the movant to show by a preponderance of the evidence that a material change in circumstances has occurred in the custodial home.” Id. (citing Riley v. Doerner, 677 So.2d 740, 743 (Miss.1996)). Additionally, the Mabus court made clear that in modifi cation proceedings the movant must also show: “(1) that a substantial change in circumstances has transpired since issuance of the custody decree; (2) that this change adversely affects the child’s welfare; and (3) that the child’s best interests mandate a change of custody.” Id. (citing Bubac v. Boston, 600 So.2d 951, 955 (Miss.1992)).
¶ 15. Ruth argues that the chancellor erred in failing to modify the original custody order to award him primary custody of Mara. Ruth’s assertions are based on two major points: that Burchfield has failed to provide Mara with proper supervision, causing her to be exposed to circumstances that could have an adverse effect on her, and that Mara’s educational needs are not being met.
*605 ¶ 16. To support his argument that Mara is not receiving proper supervision, Ruth asserts that since the initial custody order was entered, there have been instances when Mara was not properly supervised. The chancellor noted that Ruth only pointed to one instance when Mara was unsupervised: an instance when Lexie slept late instead of watching Mara while Burchfield was at work, thereby leaving Mara to fend for herself. The testimony revealed that Mara passed the time by making herself breakfast and by watching television. The chancellor then concluded that “there was no showing that the mental and emotional well-being of Mara was in danger.”
¶ 17. We cannot conclude that the chancellor’s decision, as it relates to this issue, is manifestly wrong or clearly erroneous. Furthermore, there is nothing in the record which indicates that the chancellor applied an improper legal standard. Accordingly, we have no authority to reverse his decision. This issue lacks merit.
¶ 18. Ruth also asserts that while under Burchfield’s primary care, Mara was exposed to immoral conduct because of the inappropriate activity that Burchfield allowed to transpire at her home. In his brief, Ruth states that “the drug use at the home and the sexual activity between a male of legal age and an underage female in the presence of the child, constitutes illegal and dangerous activities.” Ruth argues that the chancellor erred in not giving more weight to these concerns during his analysis of the Albright factors.[5] We note that the chancellor addressed the issues raised by Ruth regarding Mara’s supervision and Burchfield’s lack of judgment, stating:
There was no proof that these incidences resulted in any adverse effect upon the child whatsoever even though the possibility existed. The Court would be more concerned about these activities if Mother had completely shirked her parental responsibility of care and supervision. She did provide the basics and also did make the effort to put supervisory safeguards in place. The argument should be whether or not they were capable of and did put the child at unnecessary risk. The Court cannot reach that conclusion. Also, from the testimony, both the teenaged son and the girlfriend/babysitter no longer are present and the potential for adverse effect has been removed.
There was no specific proof about Father’s parenting skills other than he was active about the school and health issues of the child and responded to these quickly. As far as the day-to-day activities, the Court must conclude that there are no prohibitions or concerns about Father’s parenting skills. For the reasons stated, Father would be slightly favored.
According to Ruth, the chancellor is not obligated under the law of this state to wait until Burchfield’s actions negatively affect Mara before modifying custody and cites C.A.M.F. v. 972 So.2d 656 (Miss.Ct.App.2007) for this proposition. In C.A.M.F., this Court affirmed the chancery court’s decision to change primary custody of a minor child from the mother to the father. Id. at 658(¶ 3). In C.A.M.F. there was testimony that the mother’s husband had taken nude photographs of the child when the child was approximately six years old, often walked around the house naked, had “repeatedly *606 exposed himself to neighbors, relatives, and babysitters,” and had been physically abusive toward the mother in the child’s presence. Id. at 659 (¶¶ 6-9). We concluded that the chancellor properly considered the factors set forth in Mabus and that the chancellor did not err in finding that “while the ‘substantial and material change in circumstances may not have at this time adversely affected the child, ... this Court is not obligated to wait until such adverse change has occurred.’” Id. at 661(¶ 19) (citation omitted).
¶ 19. Ruth also cites Riley, 677 So.2d at 744 for the proposition that “[e]vidence that the home of the custodial parent is the site of dangerous and illegal behavior, such as drug use, may be sufficient to justify a modification of custody, even without a specific finding that such environment has adversely affected the child’s welfare.” In Riley, the Mississippi Supreme Court affirmed a chancellor’s decision to transfer custody of a minor child, Desiree, from the mother, Connie, to the father, Billy, even though the chancellor concluded that the father had not met the test for modification. Id. at 745. Our supreme court found that:
[0]nce the chancellor determined that Connie’s home was the site of illegal drug use, as well as other behavior adverse to Desiree’s welfare, and determined that Billy’s circumstances had improved such that he was able to provide a good home for Desiree, it was within his discretion to transfer her custody from Connie to Billy, despite the fact that he could not discern any negative effect on Desiree caused by Connie’s home environment.
Id. at 744. Further, our supreme court stated the following:
It is evident from the chancellor’s comments that he felt constrained by doctrine developed by this Court concerning custody modification from doing what he thought was best for Desiree: transferring her custody from Connie to Billy. The chancellor stated that there was “absolutely no question that ... it would be in the best interest of this child to live with her father,” but that this Court “puts the child’s best interest third and not first or second” in our test for custody modification. Since he could find no change in circumstances, the first element of the test, nor an adverse effect on Desiree, the second element of the test, the chancellor concluded that he was powerless to consider whether a change in custody was in Desiree’s best interest — the third element of the test for modification. We understand and appreciate the chancellor’s adherence to the test we have articulated. However, we take this opportunity to clarify that a chancellor is never obliged to ignore a child’s best interest in weighing a custody change; in fact, a chancellor is bound to consider the child’s best interest above all else.

Id.

¶ 20. While this Court in no way makes light of Burchfield’s actions, we note that our facts do not compare to what transpired in either C.A.M.F. or Riley; thus, we find both cases distinguishable from our case. Furthermore, we note at the outset that the issues raised by Ruth regarding conduct that Mara has been exposed to while in Burchfield’s primary care are moot. We agree with the chancellor that the potential for Mara to be adversely affected has been removed based on Burchfield’s testimony that Kim no longer baby-sits Mara, and Hunter no longer lives in her home. Notwithstanding our conclusion that this issue is moot, we point out that, pursuant to the law of this state, the chancellor was not required to wait for proof that Burchfield’s actions had ad *607 versely affected Mara. Nevertheless, we affirm the chancellor’s decision as we note, as did he, that Burchfield has removed the conditions that could have arguably had an adverse effect on Mara had they been allowed to continue. Therefore, we find no merit to this issue.
¶ 21. Ruth also contends that the chancellor erred in increasing his monthly child support payments to $500. It is well settled that “[t]he burden of proof that must be met by the party seeking a financial modification is to show a material change of circumstances of one or more of the interested parties, whether it be the father, mother, or the childfren), arising subsequent to the original decree.” McEachern v. McEachern, 605 So.2d 809, 818 (Miss.1992) (citing Cox v. Moulds, 490 So.2d 866, 869 (Miss.1986)). “The change must occur as a result of after-arising circumstances of the parties, not reasonably anticipated at the time of the agreement.” Evans v. Evans, 994 So.2d 765, 770(¶ 16) (Miss.2008) (citing Tingle v. Tingle, 573 So.2d 1389, 1391 (Miss.1990)). Chancellors should consider the following factors when determining whether a modification in child support is warranted:
(1) increased needs caused by advanced age and maturity of the children (2) increase in expenses, and (3) inflation factor. Other factors include (4) the relative financial condition and earning capacity of the parties, (5) the health and special needs of the child, both physical and psychological, (6) the health and special medical needs of the parents, both physical and psychological, (7) the necessary living expenses of the father, (8) the estimated amount of income taxes the respective parties must pay on their incomes, (9) the free use of a residence, furnishings, and automobile and (10) such other facts and circumstances that bear on the support subject shown by the evidence.
Caldwell v. Caldwell, 579 So.2d 543, 547 (Miss.1991) (quoting Adams v. Adams, 467 So.2d 211, 215 (Miss.1985)).
¶ 22. In 1999, Ruth was ordered to pay $367.03, which represented 14% of his adjusted gross income at that time. On appeal, Burchfield argues that Mara’s needs have increased, as she is now involved in extra-curricular activities, namely, softball and cheerleading. Burchfield testified that she needs additional money to pay for Mara’s uniforms, cheerleading camp, and for gasoline to get Mara to and from cheerleading and softball-related events.
¶23. Our review of the record leads us to conclude that the chancellor’s decision to increase Ruth’s child support obligation was supported by substantial, credible evidence. The chancellor stated the following in his opinion and final judgment:
The Court finds that Mother has met her burden of proof and has shown that there has been a material change in circumstances since the entry of the original decree. That is, the needs of Mara have increased and the income of Father has increased as well. Therefore, using $42,993.12 as Father’s current annual adjusted gross income, which includes deductions of mandated child support for another child, and applying the statutory guideline percentage of 14%, Father shall pay Mother $500.00 in monthly child support beginning November 1, 2007, and continuing on the first day of each month thereafter.
Ruth cites Pierce v. Chandler, 855 So.2d 455, 458(¶ 12) (Miss.Ct.App.2003), wherein this Court held that “age alone does not constitute a material change in circumstances.” We note at the outset that Pierce involved modification of custody, *608 rather than a modification of child support. Nevertheless, we recognize that in both instances the chancellor is required to find that a material change in circumstances has occurred prior to making a modification. As evidenced by the statement quoted above, the chancellor not only considered the fact that Mara was getting older as a reason to increase Ruth’s child support payments, but he also noted that Ruth’s income had increased since the original order. It is well settled in this state that an increase in income constitutes a material change in circumstances. Our supreme court stated the following in Edmonds v. Edmonds, 935 So.2d 980, 987(¶ 19) (Miss.2006):
Our Courts have found the modification of a child support award (both an increase and reduction) to be warranted on a number of grounds. See Parker v. Parker, 645 So.2d 1327 (Miss.1994) (affirming reduction in support because father’s loss of income due to loss of job was a substantial and material change in circumstances); Setser v. Piazza, 644 So.2d 1211 (Miss.1994) (finding father’s support obligation should have been abated due to material change in circumstance where hurricane destroyed his home and his truck and trailer needed for his job); Edwards v. Edwards-Barker, 875 So.2d 1126 (Miss.Ct.App.2004) (affirming increase in support where evidence showed that costs of supporting children had increased as they got older and father was making more money than at time of divorce).
¶ 24. We cannot conclude that the chancellor’s decision was manifestly wrong or clearly erroneous, nor can we say that an incorrect legal standard was applied. Therefore, we find no merit to this issue.
¶ 25. In her cross-appeal, Burch-field argues that the chancellor erred in failing to grant her request for attorney’s fees. In Setser v. Piazza, 644 So.2d 1211, 1216 (Miss.1994) (citing Cumberland v. Cumberland, 564 So.2d 839, 844 (Miss.1990)), the Mississippi Supreme Court stated that “[t]he standard for an award of attorney[’s] fees on a motion for modification of support is basically the same as that applied in an original divorce action.” The court further held that “[a]ttorney[’s] fees are not awarded in child support modification cases unless the party requesting fees is financially unable to pay them.” Id.
¶ 26. The record reflects that when asked whether she had money to retain an attorney, Burchfield responded by saying, “[n]o, not really. No, sir.” Nevertheless, the chancellor declined to grant her request for attorney’s fees and concluded that “[o]ther than Mother’s testimony that she could not pay, there was no proof otherwise. The Court notes that she is employed at a good job, has assets and child support from two sources. She also has equity in her home.” The chancellor denied Burchfield’s request for attorney’s fees after thoroughly considering whether she was financially able to pay them. Thus, we cannot second-guess the chancellor’s determination. Accordingly, we find no merit to this issue.
¶ 27. THE JUDGMENT OF THE LOWNDES COUNTY CHANCERY COURT IS AFFIRMED ON DIRECT AND CROSS-APPEAL. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT/CROSS-APPEL-LEE.
KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS AND BARNES, JJ., CONCUR. MAXWELL, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY ISHEE, J. ROBERTS, J., NOT PARTICIPATING.

. Lexie was twelve years old at the time that Burchfield allowed her to supervise Mara, and Kim was fifteen years old when she supervised Mara.

. Mara testified that there were times when Kim stayed overnight in Hunter's room. She also testified that she had witnessed Kim enter the bathroom when Hunter was already inside.

. Shortly after Mara began her first-grade year, her first-grade teacher, Pam Cobb, discussed with Ruth, Tracey, and Burchfield putting Mara back in kindergarten. Cobb testified that Burchfield expressed to her that she was willing to do whatever would be most beneficial to Mara; however, according to Cobb, Ruth stated that he wanted Mara to remain in the first grade and stated that he would get a tutor for her. Cobb stated that she worked one-on-one with Mara extensively and that Tracey helped with Mara as well. Cobb noted that Mara completed the first grade.

.Mara's second-grade teacher testified that although she communicated with Burchfield about Mara’s status, Tracey was the primary person that she spoke with regarding Mara’s progress.

. In Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983), the Mississippi Supreme Court established a list of factors that chancellors must consider when determining which parent should be awarded primary custody of a child.