52 So.3d 1279 (2011)
Bryan Keith MASTERS, Appellant
v.
Hether Brook Laird MASTERS, Appellee.
No. 2009-CA-01342-COA.
Court of Appeals of Mississippi.
February 1, 2011.
E. Michael Marks, Jackson, Julie Ann Epps, Canton, attorneys for appellant.
Robert O. Waller, Jackson, Amy D. Saling, attorneys for appellee.
EN BANC.
CARLTON, J., for the Court:
¶ 1. Bryan Keith Masters filed a motion for modification of child custody in the Hinds County Chancery Court, alleging that a material change in circumstances had occurred in the child's custodial home which was adverse to the child and warranted a change in custody from the child's mother, Hether Brooke Laird Masters, to him. After hearing the testimonies of the parties and witnesses, the chancellor found that no material change in circumstances had occurred in Hether's home and denied Bryan's motion. Aggrieved, Bryan appeals.
¶ 2. We reverse the chancellor's judgment and remand this case to the chancellor for reconsideration of her denial of the request to modify custody and for new findings in support of the chancellor's reconsidered findings.

*1280 FACTS
¶ 3. Bryan and Hether married in Rankin County in 1998. Their daughter, Sommer Grace Masters, was born later that same year. Bryan and Hether divorced in July 2000, and Hether received physical custody of Sommer. Nine years later, in March 2009, Bryan moved the Hinds County Chancery Court for a change in custody.
¶ 4. Hether testified that following her divorce from Bryan, she lived with her mother for a short period of time before moving into a residence with her then-boyfriend, Michael Poor. Hether married Poor in 2001. Hether subsequently divorced Poor in 2003, and she received custody of her child from that marriage as well. Hether then began living with a second boyfriend, Josh Pilgrim, for four consecutive years in the same residence she had shared with Poor. Hether and Pilgrim never married or had children. When her relationship with Pilgrim ended, Hether began cohabiting with her third boyfriend, Jerry Peavey.
¶ 5. At the time of the hearing, Hether had lived at her current address for approximately one and one-half years with Peavey, to whom she claimed to be engaged. Peavey was forty-seven years old at the time of the hearing. Peavey had been married and divorced twice before, and he had a twenty-eight-year-old son from an earlier relationship. Hether and Peavey also have one child together, who was three months old at the time of the hearing. Although both Hether and Peavey testified that they planned to marry in the future, the record is clear that the couple had not married nor agreed on a specific date to marry. Hether admitted in her testimony that she cohabited with three different men after her marriage to Bryan had ended. Hether cohabited with various men for eight and one-half of the nine years since her divorce from Bryan. Hether was married for only two of those years.
¶ 6. Regarding Hether's current relationship with Peavey, and its impact upon Sommer, testimony at trial reflects that Hether's cohabitation with Peavey had the potential to impact Sommer negatively. Hether testified that police officers arrested Peavey inside the home, when Sommer was present, for purchasing a stolen washing machine. Peavey testified that the arrest was for "false pretense" and that he has not been indicted. According to Peavey, police officers came to the home he shares with Hether to question him regarding the stolen washing machine. When they checked his record, they arrested him for worthless checks that Peavey claims were stolen from him and then cashed from his bank account. Peavey testified that he had filed a police report regarding the stolen checks.
¶ 7. Peavey also testified that because he is unable to work because of an on-the-job injury, he stays home with his and Hether's infant son. He also testified that he keeps Sommer and her younger half sister while Hether is away. Peavey, who only finished tenth grade, helps the children with their homework after school.
¶ 8. In his motion for modification, Bryan alleged that the following actions constituted a material change in circumstances adverse to Sommer's well-being: Hether disregarded Sommer's learning disability and failed to meet her treatment needs; Hether placed Sommer with Bryan's parents or Rita Kerry every weekend "in order to pursue her social calendar"; Hether lived with various men without the benefit of marriage in the presence of Sommer; Hether and Peavey smoked in Sommer's presence; Hether failed to provide appropriate dental care for Sommer; Peavey had a "physical altercation" with a police officer and was arrested in Sommer's *1281 presence; and Sommer suffered from a lack of self-confidence.
¶ 9. The chancellor considered the testimony provided at the trial and ultimately concluded that Bryan had failed to show a material change in circumstances adverse to Sommer warranting a modification of custody.

STANDARD OF REVIEW
¶ 10. This Court has a limited scope of review in challenges to a chancellor's decision to deny a custody modification. Creel v. Cornacchione, 831 So.2d 1179, 1183 (¶ 14) (Miss.Ct.App.2002). "We can reverse only when a chancellor's decision is either manifestly wrong or clearly erroneous, or when the chancellor has applied an erroneous legal standard." Id.
¶ 11. In order for a chancellor to modify a child-custody decree, the noncustodial parent must prove the following: "(1) that a material change of circumstances has occurred in the custodial home since the most recent custody decree, (2) that the change adversely affects the child, and (3) that modification is in the best interest of the child." Powell v. Powell, 976 So.2d 358, 361 (¶ 11) (Miss.Ct.App. 2008) (citing Giannaris v. Giannaris, 960 So.2d 462, 467-68 (¶ 10) (Miss.2007)). This Court has recognized in previous cases that while several factors are involved in the initial consideration of a child-custody award, only parental behavior that poses a clear danger to the child's physical, mental, or emotional health justifies a change in custody. See Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983); Lambert v. Lambert, 872 So.2d 679, 684 (¶ 22) (Miss. Ct.App.2003); Morrow v. Morrow, 591 So.2d 829, 833 (Miss.1991); Riley v. Doerner, 677 So.2d 740, 744 (Miss.1996).

DISCUSSION
¶ 12. The chancellor's bench ruling in this case reflects a misapplication of the law limiting her authority to consider the impact of adverse effects of the custodial parent's extramarital relationships upon the child's welfare in ascertaining whether any adverse material change of circumstance has occurred herein. Reversal is proper if this Court determines that the chancellor applied an incorrect legal standard, as our review is de novo when considering matters of law. Carter v. Carter, 735 So.2d 1109, 1114 (¶ 20) (Miss.Ct.App. 1999). Therefore, we find remand necessary to ensure that the circumstances of this case are considered under the applicable legal standards by the fact-finder. As an appellate court, we provide no finding as to whether an adverse material change occurred in this case. We instead submit such fact heavy determinations to the chancellor who is to utilize the traditional custody-modification test to determine whether any material change adverse to the child occurred in this case. See Powell, 976 So.2d at 361 (¶ 11) (citing Giannaris, 960 So.2d at 467-68 (¶ 10); Sullivan v. Stringer, 736 So.2d 514, 517 (¶¶ 15-16) (Miss.Ct.App.1999)) (explaining that a finding of adverse impacts upon a child resulting from a parent's sexual relationships, either by themselves or in conjunction with other factors, may be sufficient to give rise to a material change in circumstance).
¶ 13. The text of the chancellor's bench opinion provides that the chancellor refrained from considering the impact of Hether's various sexual or extramarital relationships in determining whether an adverse material change in circumstances had occurred sufficient to justify a change in custody. The text of the bench opinion also expressed specific concern over the instability caused by Hether's relationships, but the bench opinion also reflects that the chancellor felt precluded by precedent of the Mississippi Supreme Court from considering those effects of parental conduct. The chancellor viewed the law as *1282 precluding the consideration of the effects of parental extramarital or sexual conduct on the child's welfare; therefore, the chancellor's analysis omitted consideration of any effects upon Sommer resulting from Hether's relationships.
¶ 14. Significantly, the chancellor's bench opinion provides that a question indeed arose in the chancellor's mind as to whether Hether's unstable marital and extramarital relationships created a material change in circumstances adversely affecting Sommer. The bench opinion then continues to explain that the social fabric of our society evolved "to where living with someone without the benefit of marriage now constitutes the norm." The chancellor further provided that although she disagreed, she understood Mississippi precedent to hold that extramarital relationships constituted an insufficient basis to find a material change in circumstances that adversely affects the child and that some independent finding of adversity must exist before finding a material change in circumstances. Therefore, the bench opinion reflects a misapplication of the law precluding consideration of the effects, if any, of Hether's extramarital relationships upon the child in accessing whether a material change in custody occurred.
¶ 15. The chancellor correctly noted that the existence of an extramarital relationship by itself fails to provide sufficient basis for a finding of adverse material change. This case, however, encompasses more than the mere existence of an extramarital relationship. The chancellor's bench opinion acknowledges the instability impacting Sommer's home environment due to Hether's numerous unstable relationships. The chancellor's opinion also reflects a finding that Hether's current paramour, Peavey, lives with Hether, and the opinion notes that Peavey engaged in an altercation with the police in Sommer's presence. The record also provides that the police arrested Peavey at the home he shares with Hether, and the record reflects that this home is the custodial home. The chancellor certainly may consider the impact and the effects of the parents' relationships upon the child in determining whether a material change has occurred in the custodial home. In assessing whether a change in circumstances adverse to the child's welfare occurred, an evaluation of such circumstances may indeed include consideration of any adverse impact upon the child caused by others also living in the custodial home.
¶ 16. With respect to the educational support and stability needed, testimony in the record reveals that Sommer suffers from a learning disability, and the chancellor found Sommer needs additional help with her school work. Peavey serves as the primary child-care provider for Sommer, and he assists her with her homework despite his lack of education beyond the tenth grade. With respect to stability in the home environment, both the chancellor's opinion and the record reflect that since Hether's divorce from Bryan, Hether has cohabited with three different male companions, only one of whom she eventually married. The chancellor acknowledged that Hether's series of live-in boyfriends reflected instability in Hether's and Sommer's home environment. The chancellor nonetheless refrained from considering the impact of the relationships as to any material adverse change in circumstances in Sommer's home because she perceived the law as requiring something independent of Hether's romantic relationships to find adversity.
¶ 17. As the chancellor acknowledged, precedent indeed establishes that cohabitation alone fails to give rise to a material change in circumstances, but our case law clearly allows the chancellor to consider any adverse impact resulting from a parent's *1283 sexual relationships or cohabitation. Sullivan, 736 So.2d at 517 (¶ 16). In Sullivan, this Court stated that:
The impact of these relationships, either by themselves or in conjunction with other factors, must rise to a level justifying a change in custody. The supreme court has made plain, despite the criminal nature of these acts, that cohabitation is relevant only to the extent it can be shown to affect the child adversely. Cheek v. Ricker, 431 So.2d 1139, 1144 (Miss.1983). In effect[,] the supreme court has indicated that the mores of modern society are such that moral conduct by a custodial parent is difficult to make a requirement in a divorce. Absent a finding of some conduct harmful in a more specific sense than the certain knowledge of sexual relations between unmarried adults, one of whom is the custodial parent, the court has held that custody cannot be withheld on that basis.
Id.; see also McCracking v. McCracking, 776 So.2d 691, 694 (¶ 10) (Miss.Ct.App. 2000) (finding no evidence that the custodial parent's lifestyle caused detrimental effects to the child and that in order to change custody, the noncustodial parent bears the burden of showing an adverse material change in circumstances affecting the child).
¶ 18. As noted above, current jurisprudence provides that repeated cohabitation standing alone fails to constitute a barrier to custody. See Sullivan, 736 So.2d at 518 (¶¶ 18-19). However, as stated in Sullivan, the existence of the relationship coupled with other adverse impact on the child, or conduct that indicates the custodial parent's behavior is harmful in additional ways, provides a sufficient basis to warrant a custody modification. Id. at 518 (¶ 20). While we commend the chancellor's effort to adhere to precedent when addressing the evolving moral conduct of parents, the failure to consider the noted impact of Hether's conduct on Sommer's welfare in the evaluation of whether a material change had occurred created insurmountable error by the chancellor's misapplication of the law.
¶ 19. We acknowledge that while parents indeed possess the freedom to choose various behaviors, they nonetheless must face the consequences of the impact that their choices have upon their child's welfare and custodial home environment. In this case, the chancellor explained that while she disagreed with Hether's lifestyle choices, she concluded that the law regarding custody modifications limited her power to modify child custody. We would agree with the chancellor if the record herein reflected only the existence of cohabitation with no findings of adverse effects upon Sommer. However, the chancellor's bench opinion shows that the chancellor held a concern as to whether the mother's unstable and extramarital relationships created a material change, but the chancellor's concern was not considered in her determination of the case. Instead, the chancellor excluded consideration of the impact of those relationships upon the child because she felt precedent prevented such consideration in evaluating whether a material change had occurred. The chancellor may consider the effects, if any, of Hether's relationships upon the child as a factor in the traditional test when evaluating whether a material change of circumstances adverse to the child has occurred sufficient to warrant a custody modification.[1]See 4 Deborah H. *1284 Bell, Divorce and Domestic Relations, Encyclopedia of Mississippi Law § 28:14 at 220 (Jeffery Jackson & Mary Miller ed.2001). Indeed, in Carter, 735 So.2d at 1114, we stated that the chancellor is best equipped to listen to the witnesses, observe their demeanor, and determine their credibility and what weight ought to be ascribed to the evidence given by those witnesses. When conflicting testimony on the same issue is presented, the chancellor, sitting as the trier of fact, must determine which version he or she finds more credible. Id. However, as to matters of law, our review is de novo, and we must reverse if we determine that the chancellor applied an incorrect legal standard. Id. So, we reverse the chancellor's judgment and remand this case to the chancellor, the trier of fact, to answer the factual question of whether a material change adverse to Sommer has occurred herein.[2] In conducting that fact-determination, a chancellor possesses no obligation to turn a blind eye to an adverse impact upon the child that the chancellor finds to result from the parents' sexual conduct or relationships. When determining whether a material change in circumstances exists, the chancellor must consider the totality of the circumstances. Williams v. Willis, 49 So.3d 122, 124-25 (¶ 7) (Miss.Ct.App. 2010).
¶ 20. Based upon the foregoing, we reverse and remand this case for the chancellor to reconsider whether the effects, if any, of Hether's relationships, in conjunction with other factors, rise to a level of adverse material change sufficient to justify a change in custody.
¶ 21. THE JUDGMENT OF THE HINDS COUNTY CHANCERY COURT IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
KING, C.J., LEE, P.J., AND ISHEE, J., CONCUR. ROBERTS, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY MYERS, P.J., GRIFFIS AND MAXWELL, JJ. BARNES, J., CONCURS IN PART AND IN THE RESULT. IRVING, J., NOT PARTICIPATING.
ROBERTS, J., Specially concurring:
¶ 22. Although I concur with the majority's ultimate resolution of this case, I do not agree that the record before us indicates that this is one of those "rare cases" envisioned by the Mississippi Supreme Court in Riley v. Doerner, 677 So.2d 740, 745 (Miss.1996), in which the traditional custody-modification test can be abandoned.
¶ 23. In Riley, evidence established that the custodial parent's home was the *1285 site of illegal drug use. Id. at 744. Later, in Johnson v. Gray, 859 So.2d 1006, 1014 (¶ 39) (Miss.2003), the supreme court applied language from Riley and held that a chancellor may satisfy the "adverse effects" finding required in custody modification by finding reasonably foreseeable adverse effects if the child continues in the adverse environment. The reasonably foreseeable adverse effects in Johnson were due to the mother's "involve[ment] in car accidents, arrests, and fits of rage, all attributable to her alcoholic stupors." Id. In Glissen v. Glissen, 910 So.2d 603, 611 (¶ 25) (Miss.Ct.App.2005), we affirmed a chancellor's decision to modify custody based on the prospective adverse-effect language stated in Riley. In Glissen, the modification of custody was based on the mother's live-in boyfriend's "[adverse] [e]ffect [on] the girls because [the boyfriend] refused to exercise full visitation rights with his own children, because the evidence showed that [the boyfriend] abused drugs and alcohol and became violent, and because [the boyfriend] was a convicted felon." Id. at 612 (¶ 29). However, the mother's relationship with her boyfriend was not the sole basis behind the chancellor's decision to modify custody. Id. The chancellor also found that: the mother was untruthful; she had questionable judgment; "she only pretended to be interested in morals"; and the children "were innocent and at an impressionable age." Id.
¶ 24. In Savell v. Morrison, 929 So.2d 414, 419 (¶ 17) (Miss.Ct.App.2006), we again affirmed a chancellor's decision to modify custody based on a reasonably foreseeable adverse effect as a result of a material change in circumstances. In Savell, the mother's new husband "indicated he was prepared to go to jail in the event that he `snapped' and whipped" the child. Id. at 416 (¶ 6). The new husband "confirmed that he hollered[,] `I don't give a f-what you like[,]' when [the child] asked him to turn down the car radio." Id. The new husband further "indicated that it was his belief, after talking to an attorney, that he could yell at [the child] whenever he wanted." Id. at 416-17 (¶ 6). He admitted he screamed at the child on an almost daily basis. Id. at 417 (¶ 6). Not only that, the new husband admitted he wanted to "duct tape [the child] to a chair" and "repeatedly hit, or `pepper,' [the child] with paintballs." Id. Finally, the new husband threatened the child with a belt after she talked back to her mother, "scaring [the child] to the point that she turned white." Id.
¶ 25. In Gainey v. Edington, 24 So.3d 333, 338 (¶ 18) (Miss.Ct.App.2009), we reversed and remanded the case to allow the chancellor to consider the custodial father's conduct in light of the Riley standard when: "[t]he combined issues [that the chancellor was presented with] include[d]: the children's poor grades, untreated gait problem, initially untreated and recurrent ear problems resulting in hearing loss, both girls' staph infections [being] contracted subsequent [to] [the custodial father's current wife's] staph infection, and the deplorable condition of the girls' teeth." We further held that "[a]ll of these [issues] reflect a continuing pattern [of] an overall neglect for the health and welfare of the children." Id.
¶ 26. Additionally, the facts of this case are arguably less egregious than those of Ruth v. Burchfield, 23 So.3d 600 (Miss.Ct. App.2009), in which, notwithstanding a dissent urging the application of the Riley exception, we upheld the chancellor's denial of the non-custodial parent's motion for custody modification. In Ruth, Steve Ruth filed for custody modification and sought primary physical custody of the couple's child, Mara, from London Suzette Burchfield. Id. at 602 (¶ 4). In his motion, Ruth made the following allegations in an effort *1286 to show a material change in circumstances that adversely affected Mara: "(1) that Mara had not been properly supervised while in Burchfield's primary care, (2) that Burchfield was not properly addressing Mara's educational needs, and (3) that Mara had been exposed to conduct that was detrimental to her moral upbringing." Id.
¶ 27. Concerning Mara's supervision, Burchfield testified that she allowed a twelve-year-old and a fifteen-year-old to baby-sit Mara, who was approximately nine years old at the time. Id. at (¶¶ 5-6). Additionally, Burchfield allowed the fifteen-year-old babysitter, Kim, to occasionally spend the night prior to learning of an inappropriate relationship between Kim and Burchfield's twenty-year-old son, Hunter, who also lived in the house. Id. at 602-03 (¶ 6). However, Burchfield stated that upon learning of the relationship, she no longer allowed Kim to spend the night, but she continued employing her as a babysitter for another two or three weeks. Id. at 603 (¶ 6).
¶ 28. Regarding Mara's educational needs, the testimony revealed that Mara had initially struggled in kindergarten and first grade, but she was progressing normally. Id. at 603 (¶¶ 7-8). Finally, concerning Mara's moral upbringing, Burchfield admitted that Hunter had used marijuana in the house and that Burchfield had sexual relationships with past boyfriends who had stayed overnight at her home. Id. at 603-04 (¶ 9). However, Burchfield claimed Hunter had moved out and was not living with her at the time of the hearing. Id. at 604 (¶ 10). Additionally, she claimed that her current boyfriend had never stayed the night at her house. Id. at (¶ 11).
¶ 29. At the conclusion of the hearing, the chancellor held that there had been no material change in circumstances adverse to Mara's best interest. Id. at (¶ 12). Ruth appealed and alleged that the chancellor should have modified custody based upon the Riley exception. Id. at 606 (¶ 19). Despite the dissent's argument that Burchfield's conduct possibly amounted to child neglect and condoned criminal activity in the custodial home, including drug use, this Court held that the Riley exception was inapplicable to facts of the case, and we affirmed the chancellor's denial of Ruth's motion for modification. Id. at 606 (¶ 20), 609-610 (¶¶ 31-33 Carlton, J., dissenting).
¶ 30. As was the case in Ruth, it is my opinion that the facts of the case before us now similarly do not warrant application of the Riley exception. Quite frankly, the facts of this case simply do not rise to the level exhibited in Riley, Johnson, Glissen, Savell, or Gainey. Furthermore, trying to force the Riley exception upon the circumstances of this case does nothing more than dilute the exception created by the supreme court to the point that it is no longer the exception, but the rule. While the best interest of the child is always on the forefront, such an outcome is not what the supreme court envisioned.
¶ 31. In this case, Bryan Masters alleged in his motion for modification that the following actions constituted a material change in circumstances that were adverse to Sommer Masters' well-being: Hether Masters disregarded Sommer's learning disability and failed to meet her treatment needs; Hether placed Sommer with Bryan's parents nearly every weekend "in order to pursue her social calendar"; Hether lived with various men without the benefit of marriage in the presence of Sommer; Hether and Jerry Peavey smoked in Sommer's presence; Hether failed to provide appropriate dental care for Sommer; Peavey had a "physical altercation" with a police officer and was arrested in Sommer's presence; *1287 and Sommer suffered from a lack of self-confidence. In an effort to summarize the applicable testimony given during the hearing, it will be discussed in relation to each allegation brought by Bryan. The chancellor found that none of Bryan's allegations had any merit except for cohabitation.

A. Cohabitation
¶ 32. Hether, who was twenty-nine years old at the time of the hearing, testified that following her divorce from Bryan, she lived with her mother for a short period of time before moving into a residence with her then boyfriend, Michael Poor. In April 2001, approximately nine months after her divorce from Bryan, she had a child with Poor. She married him later that year. But she subsequently divorced Poor in 2003 and was awarded physical custody of that child. Hether then cohabitated with a second boyfriend, Josh Pilgrim, for four consecutive years. But she did not marry or have any children from that relationship. After that relationship ended, Hether began cohabitation with her third boyfriend, Peavey.
¶ 33. At the time of the hearing she had lived at her current address for approximately a year and one-half with her boyfriend and claimed fiancé, Peavey, who was forty-seven years old at the time of the hearing. Peavey had been married and divorced twice previously and had a twenty-eight-year-old son. Hether and Peavey also had one child together, who was three months old at the time of hearing. Although they both testified that they had plans to marry at some point in the future, the record is clear that Hether and Peavey were not married, and they had not agreed upon any specific date to marry. Hether's testimony indicated that she had cohabitated with three different men for a total of approximately eight and one-half of the nine years since her divorce from Bryan, only two years of which she was married to one of them. At the time of the births of all her children, she was unmarried.

B. Hether's "Social Calendar"
¶ 34. One of Bryan's allegations in support of his request for custody modification was that Sommer was left with his parents almost every weekend in order to allow Hether to pursue her "social calendar." In regard to this allegation, Hether testified that she was employed as a waitress at Penn's Restaurant and typically worked seven days a week. As a result of her work schedule, she occasionally asked Bryan's parents to watch Sommer. Additionally, Peavey characterized Sommer's visits with Bryan's parents as "visitation" rather than "baby-sitting."

C. Sommer's Learning Disability
¶ 35. Bryan's next allegation was that Hether did not sufficiently deal with Sommer's learning disability. Hether acknowledged that, since kindergarten, Sommer has had a learning disability. Sommer was having academic problems in mathematics and reading. Bryan testified that in 2006, he noticed that Sommer's grades were slipping. He and Hether discussed changing custody then, but they decided not to do so. According to Bryan, in 2008, Sommer's grades were still not improving, and Bryan offered to enroll and pay for Sommer's participation in a private tutorial service. Hether would not agree. During cross-examination, Bryan admitted that after he filed for modification of custody, Sommer was receiving the special attention she needed with regard to her learning disability. Further, he admitted that Sommer had passed all grades since kindergarten, although she had to remain in kindergarten an extra year.
¶ 36. Hether testified that at the time of trial, Sommer was getting ready to enter the fifth grade, and Sommer had never *1288 failed a grade since kindergarten. Hether further claimed that she routinely helped Sommer with her homework, and she obtained a tutor for Sommer. The tutor was Ashton Robinson, a seventeen-year-old high-school student who volunteered to help Sommer. Darla Masters, Bryan's current wife, also stated that she helped Sommer with her homework when Sommer visited Bryan. At the time of the hearing, Peavey had been out of work for approximately seven months after he had injured himself at work. The record indicates that he provided no steady earned income to the home during this time. Peavey claimed to have employed an attorney to pursue a workers' compensation claim against his employer. Although Peavey claimed to be disabled as a result of his injury, he stayed at home and took care of the children while Hether was at work. Peavey stated that although he had only completed the tenth grade, he also helped Sommer with her school work. Peavey claimed that Sommer's grades had improved since he had started helping her.

D. Peavey's Arrest
¶ 37. Another allegation in Bryan's petition was that three months prior to the July 2009 hearing, Peavey had a physical altercation with a police officer in Sommer's presence and was arrested. Hether explained the circumstances that led to Peavey's arrest. She and Peavey had bought a used clothes dryer that turned out to be stolen. As a result, Peavey was arrested. But after questioning and temporary incarceration, he was bonded out. However, Peavey clarified Hether's version of events. Peavey explained that he did not go to jail for possession of a stolen dryer; instead, he was arrested for "false pretenses." However, Peavey testified that the charge against him was a mistake and involved three of his checks that he claimed he had previously reported stolen. Bryan later testified that he had no personal knowledge of either the incident or criminal charges against Peavey. Peavey testified that he assumed he was still on his $1,000 bond for the false-pretense charge, but he believed the charge would not be prosecuted.

E. Hether and Peavey Smoke Around Sommer
¶ 38. Bryan and Darla testified that Sommer's clothes and bags smelled like cigarette smoke when she would come to visit. Bryan also stated that Hether and Peavey routinely and consistently smoke in Sommer's presence. As an example of the effect the smoking had on Sommer, Bryan testified that he took Sommer to a clinic because she had sinus issues and would often cough during the night when she visited him. Sommer was prescribed a nasal spray and other medication. Bryan stated that when he got Sommer back from Hether, Sommer always returned with empty pill bottles and other medication containers, and he had to get them refilled.
¶ 39. In response to Bryan's allegation that she and Peavey smoke around Sommer, Hether testified that she and Peavey did smoke cigarettes, but since the filing of the modification motion, she had begun to smoke only outside because of Sommer's allergies. She stated that she quit smoking inside because it was not good for Sommer's sinuses. Peavey also testified that the couple began smoking outside approximately four months prior to trial.

F. Sommer Lacked Dental Care
¶ 40. In response to Bryan's allegation that Sommer lacked dental care, Hether testified that was not true. She stated that she regularly took Sommer to the dentist and that Sommer had no dental issues. When asked about Sommer's dental care, Bryan testified that he did not *1289 know if she received regular dental care or not.

G. Sommer Lacked Self-Confidence
¶ 41. Lastly, Bryan alleged that Sommer lacked self-confidence. As proof of this, Darla testified that when she took Sommer to dance class, Sommer would move to the back of the class. But on cross-examination, she stated that Sommer was a happy child for the most part. During her testimony, Hether denied Bryan's allegation that Sommer lacked self-confidence. She stated that Sommer's teacher said that Sommer was always smiling and very happy.

H. Further Testimony
¶ 42. In addition to the testimony summarized above, Robinson and Rita Kerry testified on behalf of Hether. Robinson was eighteen years old at the time of the hearing and testified that she had known Hether for approximately four years. Robinson testified generally about the condition of Hether's home, Peavey's interaction with Sommer, and Sommer's general condition. She stated that: Hether's home was very clean; Sommer was well fed and taken care of; Sommer was a happy child; and Peavey was good to Sommer and respected by her. Robinson further stated that she also frequently helped Sommer with her school work.
¶ 43. Kerry is Hether's mother. She testified that Hether's home was immaculate and that Hether was a good cook. Kerry further stated that she believed Peavey was a good person, and he treated Sommer as his own daughter. Kerry testified that Hether took Sommer to the doctor and dentist. She stated that Sommer was provided with everything she needed.
¶ 44. After presentation of the testimony summarized above, the chancellor found that the evidence presented was insufficient to support all of the allegations raised by Bryan except cohabitation. Based upon the testimony given during the modification hearing, it is my opinion that the chancellor was not manifestly wrong in finding as such. Therefore, there were no other current "factors" that were alleged by Bryan that the chancellor could have considered except for the remaining, and uncontested, claim of cohabitation. However, that is not to say that Hether's cohabitation was the only indiscretion that the chancellor could have considered in making the determination of whether there had been a material change in circumstances, or that the chancellor was restricted by those allegations contained in Bryan's complaint. Indeed, a "chancellor must allow full and complete proof with respect to all circumstances and conditions directly or indirectly related to the care and custody of the children, existing at the time of the original divorce decree and at the time of the modification hearing." Johnson, 859 So.2d at 1013 (¶ 34) (quoting Smith v. Todd, 464 So.2d 1155, 1158 (Miss. 1985)).
¶ 45. Regarding cohabitation, Mississippi appellate courts have stated that maintaining a sexual relationship/cohabiting outside the confines of marriage cannot be the sole ground for a finding of a material change in circumstances. See Phillips v. Phillips, 555 So.2d 698, 701 (Miss.1989); Cheek v. Ricker, 431 So.2d 1139, 1144 (Miss.1983); Sullivan, 736 So.2d at 518 (¶ 19); see also Forsythe v. Akers, 768 So.2d 943, 948 (¶ 12) (Miss.Ct.App.2000) ("[T]he number of relationships [the custodial mother] has been in are not enough by themselves to prove a material change of circumstances.") (citing Kavanaugh v. Carraway, 435 So.2d 697, 700 (Miss.1983)). That is, unless it is "coupled with other conduct that indicates the custodial parent's behavior is harmful in additional *1290 ways...." Sullivan, 736 So.2d at 518 (¶ 19).
¶ 46. My review of the record reveals that the chancellor should have considered the testimony concerning: Hether's two other children that were born out of wedlock; entrusting the care of Sommer with Peavey and other men with which she cohabitated without the benefit of marriage; the possible instability in the family unit created by Hether's multiple relocations and multiple, long-term, live-in boyfriends; the substantial age difference between Hether and Peavey; and the fact that she immediately, willfully, and continuously breached the agreed custody decree since her divorce from Bryan by subjecting Sommer "to immoral conditions during visitation ... [by having] overnight company with a member of the opposite sex not related by blood or marriage in the presence of the minor child, outside of marriage." The child-custody agreement stated, among other things, that "the child [shall not be] subjected to immoral conditions during visitation by either party. Specifically, neither party shall have overnight company with a member of the opposite sex not related by blood or marriage in the presence of the minor child, outside of marriage."
¶ 47. As to Hether's almost constant violation of the custody decree in regard to cohabitation, we note that Mississippi Code Annotated section 93-5-2(2) (Supp.2010) states that:
If the parties provide by written agreement for the custody and maintenance of any children of that marriage and for the settlement of any property rights between the parties and the court finds that such provisions are adequate and sufficient, the agreement may be incorporated in the judgment, and such judgment may be modified as other judgments for divorce.
In terms of custody, implicit in this discretionary authority to adopt and incorporate a written agreement of the parties into the final judgment of divorce is a required finding by the chancellor that the best interest of the minor child is furthered by the agreement. In this case, there is no question that both Bryan and Hether voluntarily agreed to the "child custody, child support, and separation and property settlement agreement," which included the language quoted above. As such, the chancellor must have found that exposing Sommer to "overnight company with a member of the opposite sex not related by blood or marriage" was not in her best interest. It appears to me that one of the considerations that Bryan felt was important in arriving at his agreement for Hether to have primary physical custody of Sommer was Hether's sworn agreement that she would not raise their child in an immoral environment, one where cohabitation with a male companion out of wedlock does not occur. However, Hether obviously failed to abide by the agreement.
¶ 48. Typically, "[a]s to issues of fact where no specific findings have been articulated by the chancellor, [the appellate court] proceeds upon the `assumption that the chancellor resolved all such fact issues in favor of the appellee.'" Sullivan, 736 So.2d at 515 (¶ 9) (quoting Anderson v. Anderson, 692 So.2d 65, 72 (Miss.1997)). However, if an incorrect legal standard was applied no such inference will be made. Id. In this case, it is clear that the chancellor proceeded under the presumption that the "totality of the circumstances" was encompassed only by those allegations raised by Bryan. As stated above, such is not the case. Therefore, there can be no presumption that the chancellor found that those considerations listed above were resolved in Hether's favor. As such, without relying on or diluting the narrow exception created in Riley, *1291 I would reverse the chancellor's judgment and hold that given the totality of the circumstances, a material change in circumstances has occurred in Hether's home since the July 2000 final judgment of divorce. Further, I would remand this case to allow the chancellor to make a determination as to possible adverse effects, if any, the material change in circumstances has had on Sommer, and whether the best interest of Sommer would be furthered by changing custody as evinced by a balancing of the Albright factors. See Albright v. Albright, 437 So.2d 1003, 1005 (Miss. 1983).
MYERS, P.J., GRIFFIS AND MAXWELL, JJ., JOIN THIS OPINION.
NOTES
[1] In cases where the custodial parent places the child at risk, the supreme court in Riley, 677 So.2d at 744-45, expressed concern that chancellors felt constrained by the framework for custody modification which requires a material change in circumstances before a chancellor may modify a custody order. The supreme court stated the following:

when the environment provided by the custodial parent is found to be adverse to the child's best interest, and that the circumstances of the non-custodial parent have changed such that he or she is able to provide an environment more suitable than that of the custodial parent, the chancellor may modify custody accordingly.
Id. at 744.
Noting that the court's polestar consideration in child-custody matters is the best interest of the child, the supreme court further stated the following with regard to the requirements for a modification of child custody:
The test we have devised for custody modification need not be applied so rigidly, nor in such a formalistic manner so as to preclude the chancellor from rendering a decision appropriate to the facts of an individual case. In particular, it should not thwart the chancellor from transferring custody of a child from one parent to another when, in the chancellor's judgment, the child's welfare would be best served by such transfer.
Id. at 745.
[2] See also Riley, 677 So.2d at 744.