WALLER, Chief Justice,
dissenting:
, ¶33. I fully support and concur with the majority’s holding that clarifies the requirements for a modification of custody between a parent and a third party, such as a grandparent. However, I do not believe that the chancellor in this case was presented with sufficient evidence of a material change in circumstances for the thirty-five days that passed .from the agreed order to the petition for modification. Even giving the Fosters the benefit of the doubt on all charges supporting their petition for modification, there still is insufficient proof to rebut the strong presumption that it is in the child’s best interest to remain with a natural parent. Accordingly, I respectfully dissent.

Material Change of Circumstances

¶34. In his written opinion, the chancellor found a material change in circumstances but never articulated what facts constituted that change. In his more detailed bench opinion, the chancellor never addressed any intervening change, but instead 'began his analysis, by determining that Irle had lost the natural-parent presumption.
¶ 35. The Fosters argued before the chancellor that a material change in circumstances arose after the February 18, 2011, agreed order when Irle Sent Britney to Kentucky, where she allegedly stayed with Irle’s sister, Andrea Fore, and her live-in boyfriend, Eric Brock, who had been indicted for sexually abusing a minor. The Fosters further alleged that, while Britney was in Kentucky, Irle went on a multi-day drug binge and subsequently wrecked her van with one of her other children inside the vehicle. This alleged episode resulted in the Department of Human Services (DHS) taking Britney from Irle and temporarily placing her with the Fosters while it conducted an investigation. However, DHS found no evidence of impropriety and returned custody to Irle.
¶ 36. There was no testimony at trial that Britney stayed with Brock while in Kentucky. In fact, the only testimony that Britney had ever been around Brock was from Britney. She testified that, on a previous trip to Kentucky, where she was accompanied by her mother and her uncle Robert. Irle, she stayed with her aunt and Brock, but that she was never left alone with Brock.[19]
¶ 37. More disconcerting though, is the Fosters’ allegation that Irle planned to move in with Fore and Brock after- moving to Chicago. While a mere move out of state does not constitute a material change in circumstances, additional factors may render such a move an adverse material change ánd could even rise to the level of rebutting the natural-parent presumption. See Giannaris v. Giannaris, 960 So.2d 462, 468 (Miss.2007) (providing that a mere move of a parent does not constitute a material change). Here, the testimony shows that Irle planned to move to the Chicago area, but that she planned to live with her sister Nora Jefferson. Fore tes- *1241 tiffed that the plan was never for Irle and Britney to live with them after the -move. She stated that the plan had always been for Irle and Britney to live-with Jefferson and her family. Jefferson confirmed this, testifying that if Irle retained custody, Irle and Britney would move to Hammond,' Indiana, outside Chicago, to live with her. Irle also testified that this was her intention if she retained custody of Britney, adding that Britney would not be around Brock if they moved and that-certainly she would not live in the same house as Brock.
¶ 38. The only testimony to the con-' trary was from Britney, who was twelve years old at the time of trial. She testified that she believed they would stay with Fore and Brock if they moved to Chicago. There was no other evidence or testimony that Irle planned such a move.
¶ 39. Indeed, the record reveals through the testimony of the Fosters that they largely filed this complaint because they were afraid Irle would move to the Chicago area, taking Britney with her. Patty Foster, Britney’s paternal grandmother, testified that Britney had been well-cared-for in Irle’s custody and that their current visitation schedule worked well. But, Patty added, she thought Irle needed help with her alleged drug problem, and she did not want Britney to grow up to be like Irle, whom she described as “liv[ing] off the state, food stamps, and the government.” Patty also testified, however, that she did not fear for Britney’s well-being while in Irle’s custody, but that she did not like the fact that Irle seemingly had a number of male companions. Yet, on at least one occasion after February 18, 2011, Patty asked Irle to babysit another of Patty’s deceased son’s children of whom the Fosters had custody. ' Additionally, when pressed on cross-examination, Patty testified the reason Irle should not have custody of Britney was that Irle would “move up north” and take Britney with her.
¶ 40.' Lavirl Foster, Britney’s grandfather',1 testified that Irle should not have custody because she would move to Chicago and live with a “pedophile.” ' He further testified that, “the part I’m afraid of is Irle leaving the state” and that there was no danger in Irle retaining custody if she remained in Mississippi. Lavirl stressed that his concern whs about her going to Chicago, stating that, even if Irle was ordered to stay awhy from Brock, she did not have sufficient funds and that she and Britney would end up living in a bad neighborhood.
¶ 41. But, as noted above, a mere move out of state, by itself, does, not constitute a material change in circumstances adverse to the child, much less such a significant change that would call into question the natural-parent presumption. See Giannaris, 960. So.2d at 468; Grant v. Martin, 757 So.2d 264, 266 (Miss.2000) (noting that natural parents enjoy a strong presumption regarding custody).
¶ 42. Moreover, the chancellor did not consider whether the issue of living with Brock was moot. A custody “modification should not be ordered if a material change has been remedied.” Deborah H. Bell, Bell on Mississippi Family Law § 12.11(5)(a), 396 (2d ed.2011); see also Ruth v. Burchfield, 23 So.3d 600, 606 (Miss.Ct.App.2009). Irle testified that she had no plans to live in the same home as Brock. Additionally, the chancellor has the authority to ensure that remedy remains intact. This means the chancellor can and should consider providing safeguards or restrictions regarding Britney’s residing in the same home as, and exposure to, Brock.
¶ 43. The DHS inquiry revealed no impropriety, abuse, or neglect. After the *1242 investigation, full primary physical custody was returned to Irle.
¶ 44. Further, the chancellor did not find any actual adverse effect on Britney regarding any .of the alleged changes in circumstances. The rule requires a finding of a material change in circumstances that “clearly posits or causes danger to the mental or emotional well-being of a child.... ” Giannaris, 960 So.2d at 468. That is not to say, however, that a chancellor must always wait for the child to suffer actual harm before modifying custody. Where a custodial environment is dangerous and clearly adverse to the child’s best interests, a chancellor is not precluded from modifying custody just because somehow the child “appears to remain uns-carred by his or her surroundings.... ” Riley v. Doemer, 677 So.2d 740, 744 (Miss.1996). Here, there was no evidence that Britney was in any actual danger. And to the extent there was a potential danger, that threat — living with Brock — had been remedied. See Ruth, 23 So.3d at 606; Deborah H. Bell, Bell on Mississippi Family Law § 12.11(5)(a) (2d ed.2011). While I agree with the majority that the chancellor is entitled to deference in his interpretation of the facts, I do not believe that substantial credible evidence supports a finding that a material change in circumstances occurred that would warrant a modification of custody. Rather, the weight of the evidence indicates that Britney would not have unsupervised, if any, contact with Brock.

Natural-Parent Presumption

¶ 45. Natural parents, as a general rule, have a right to custody of their children. Simpson v. Rast, 258 So.2d 233, 236 (Miss.1972). There is a “strong presumption that a natural parent’s right to custody is superior to that of third parties,” including grandparents. Grant, 757 So.2d at 266. To overcome this presumption, there must be a clear showing that the parent has (1) abandoned or deserted the child, (2) the parent is unfit mentally or otherwise, or (3) the parent’s conduct is so immoral as to be detrimental to the child. Barnett v. Oathout, 883 So.2d 563, 567 (Miss.2004) (“Absent clear proof of one of the above circumstances, the natural parent is entitled to custody of his or her child.”); Rodgers v. Rodgers, 274 So.2d 671, 673 (Miss.1973).
¶46. Here, this last factor, moral fitness, is at issue. In addition to finding a material change in circumstances, the chancellor must have found a clear showing that Irle’s alleged immoral behavior was so grievous that it presented a legitimate and significant danger to Britney or was actually harmful to her. Rodgers, 274 So.2d at 673; Deborah H. Bell, Bell on Mississippi Family Law § 12.06(3)(a) at 371 (2d ed.2011) (providing that to award custody to a grandparent over a natural parent based on moral unfitness, “a court must find [by clear evidence] that [the] parent engaged in conduct presenting a genuine serious danger to [the] child.”). A review of the chancellor’s ruling shows that he found Irle morally unfit; however, substantial credible evidence does not support such a finding. See Rodgers, 274 So.2d at 673.
¶ 47. The chancellor’s ruling on Irle’s moral fitness relied heavily on her alleged drug use and overnight visits with Gary Volyes, as well as the fact that Irle had four children out of wedlock. Because all of Irle’s children were born prior to February 2011, the trial court clearly erred in considering this fact.
¶ 48. The chancellor likewise erred in concluding that Irle’s overnight visits constituted a lack of moral fitness. Here, there was undisputed testimony that Irle and Britney spent the night at Voyles’s house on six different occasions. Irle and *1243 Voyles both testified that Irle slept on the couch, Voyles slept in his bedroom, and Britney slept in another bedroom. Irle and Voyles also testified that there was no sexual involvement between the two. When asked about Voyles, Britney testified that she liked him and liked the fact her mother was in a relationship with him.
¶49. Even giving deference to the chancellor’s interpretation of the facts, as we must do, this evidence is legally insufficient to support a finding of moral unfitness. This Court has noted that an overnight stay with a member of the opposite sex to whom the parent is not married does not constitute immoral behavior requiring modification of child custody. See Robison v. Robison, 722 So.2d 601, 605 (Miss.1998); Harrington v. Harrington, 648 So.2d 543, 547 (Miss.1994); Dunn v. Dunn, 609 So.2d 1277, 1286 (Miss.1992). There must also be objective proof that the overnight visitation is detrimental to the child. See Harrington, 648 So.2d at 547; Dunn, 609 So.2d at 1286. Here, there was no evidence that Irle’s overnight visits with Voyles were harmful to Britney.
¶ 50. Regarding Irle’s alleged drug use, the only objective evidence that Irle had used drugs after February 18, 2011, was a failed drug test administered by the guardian ad litem (GAL) in October 2011. Irle claims the result was a false positive, and she took another drug test the following day, which she passed. While the testimony indicated that Irle had used illegal drugs in the past, with the exception of the one failed drug test,[20] there was little evidence of a current drug problem.
¶ 51. Because the Fosters failed to put on clear evidence rebutting the natural-parent presumption, the chancellor erred in finding Irle morally unfit and stripping her of that presumption. As this Court has stressed previously, parents are entitled to a strong presumption that it is in a child’s best interest for a natural parent to retain custody. Grant, 757 So.2d at 266. The chancellor relied on either legally insufficient or unsubstantiated evidence to rebut this presumption. Therefore, I would reverse and remand this matter to the trial court for further proceedings consistent with this opinion.
KING, J., JOINS THIS OPINION.

. It is unclear from the record when this visit actually took place. Britney initially testified that it was after February 2011, but then later testified that she did not actually remember when this trip took place, but that it may have been in 2010. The record indicates that, during the Kentucky visit that the parties agree took place after February 18, 2011, Fore and Brock already had moved to Chicago. It therefore seems that this other Kentucky trip, in which Britney stayed with Fore and Brock, was sometime before February 18, 2011, possibly in 2010. It also is not clear whether Brock had been indicted at that time.

. Irle actually failed two drug tests administered by the GAL, but they were both administered on the same day. The GAL gave the second test immediately after the first because Irle claimed it was false positive. Irle passed a drug test the next day.